SOUTH JERSEY SAND COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58953. Filed May 26, 1958.

*George Craven, Esq.*, and *Converse Murdoch, Esq.*, for the petitioner.

*Max J. Hamburger, Esq.*, for the respondent.

Respondent determined deficiencies in petitioner's income tax for the years 1951, 1952, and 1953 in the respective amounts of $32,746.33, $16,356.62, and $23,346.20.

A minor issue relating to the determination for 1953 has been resolved by the parties. The only issue remaining in this litigation is whether petitioner mined "quartzite," which would entitle it to a 15 per cent depletion deduction, or "sand," which would entitle it to a 5 per cent depletion deduction.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioner, South Jersey Sand Company, is a corporation incorporated under the laws of New Jersey, and has its principal office and place of business at Dividing Creek, New Jersey. Petitioner filed its income and excess profits tax returns for the years 1951, 1952, and 1953 with the collector of internal revenue for the first district of New Jersey.

The South Jersey Sand Company during 1951, 1952, and 1953 was engaged in the business of mining or dredging, and selling sand from deposits in the immediate vicinity of its office and place of business.

During the years in question the sand deposits of petitioner were located on 1,888.3 acres of land owned by it, and on two tracts leased by petitioner on a royalty basis. The leased tracts were known as the Blizzard tract and the Dilks tract. The former comprised 76 acres and the latter 1,215.8 acres.

Petitioner's operations begin with the removal of overburden, made up of vegetation, soil, and gravel, until it strikes certain strata rich in quartz sand. The strata contains unconsolidated deposits of clay, sand, granules, pebbles, and cobbles. These deposits are worked by a process known as wet pit mining or dredging. A dredge housing a motor-driven pump extracts the deposited material which is then transported by pipelines to screening stations. At these stations the sand is screened out, fed into a steel hopper, and, by means of a motor-driven pump, transported through pipelines to a wash plant.

At the wash plant the sand is carried through clear water by spiral screw conveyors for the purpose of removing clay or sediment. After washing the sand is transported by pump and pipeline to concrete storage silos where it is stored and drained of moisture.

Petitioner has a contract with the Pennsylvania Glass Sand Corporation (hereinafter sometimes referred to as P. G. S.), dated January 29, 1951, which is to run for 10 years from that date and as long afterwards as P. G. S. pays to petitioner the purchase price of the minimum tonnage required under the contract. In the contract petitioner agreed to convey to P. G. S. a tract of approximately 7.3 acres of land adjoining a railroad right-of-way, and certain rights on petitioner's land, including the right to construct and maintain railroad tracks and sidings, roads, buildings, stock piles, and waste piles; to use existing roads, to erect poles and string wires for electric light, power, and telephone service; to lay water pipes, dig or sink water wells, take an adequate supply of water, and dispose of waste water; and to remove any or all of such property.

In the contract petitioner agreed to sell and P. G. S. agreed to buy a minimum of 2,000 tons per month of first quality, thoroughly washed and screened white sand known as New Jersey No. 1 silica sand and as much more as P. G. S. might want or order. P. G. S. agreed to pay $1.40 per ton for the sand until such time as P. G. S. should assume the cost of tabling and further beneficiation of the sand, after which time the purchase price should be $1.27 per ton. It was agreed that petitioner would not dissipate its reserves by selling or delivering its sand to anyone other than P. G. S., except to foundries for core purposes.

The number of tons of sand which were mined and sold by petitioner during the years in question and the purposes to which the sand was put by the ultimate purchasers are as follows:

|  | Number of tons | | |
|---|---|---|---|
|  | 1951 | 1952 | 1953 |
| Glass manufacture | 341, 214 | 323, 620 | 365. 321 |
| Foundry | 8, 532 | 2, 590 | 2, 032 |
| Building (masonry, etc.) | 259 | 728 | 478 |
| Golf course sand |  |  | 886 |
| Total number of tons | 350, 005 | 326, 938 | 368, 717 |

The petitioner's only customer for the sand sold for use in the manufacture of glass was P. G. S. P. G. S. in turn sells the sand to glass manufacturers. The sand of petitioner was mined primarily for use in the manufacture of glass. Petitioner has no sales force and does not solicit sales of sand for other purposes.

The sales of petitioner's sand, other than to P. G. S., were made to customers who came to the petitioner's plant and requested that they

be permitted to purchase sand. The petitioner has never had any contracts for sales of the sand for purposes other than the manufacture of glass. The sand sold for foundry purposes was used in the formation of molds and cores into which hot molten metal is poured. The sand is used because of its resistance to the heat from the molten metal.

The sand which was sold for foundry, building, and golf course purposes was sold at $1.40 to $1.65 per ton, depending on how the sand was loaded and the time required to load it. Some sand was sold to other sand companies at a net price of $1.40 to $1.45 per ton. Although some of the sand sold for purposes other than glass manufacture was usually coarser than that delivered to P. G. S., all of it was sand which would be acceptable for the manufacture of glass insofar as P. G. S. pulverized the sand into powder. The expense of processing the sand sold to customers other than P. G. S. is about the same as that of processing the sand sold to P. G. S.

In 1956 petitioner mined sand solely from the Blizzard tract. Sand taken from that tract and processed through petitioner's screening and washing operations, when dried at 110° centigrade, has the following chemical content:

|  | Per cent |
|---|---|
| Silicon dioxide ($SiO_2$) | 98.98 |
| Iron oxide ($Fe_2O_3$) | 0.151 |
| Aluminum oxide ($Al_2O_3$) | 0.31 |
| Titanium dioxide ($TiO_2$) | 0.411 |
| Calcium oxide ($CaO$) | Trace |
| Magnesium oxide ($MgO$) | Trace |
| Sodium oxide ($Na_2O$) | 0.01 |
| Potassium oxide ($K_2O$) | Trace |
| Loss on ignition | 0.12 |
|  | 99.982 |

This sand is substantially similar to the sand mined by petitioner during the years in question. The high silicon dioxide and low iron oxide content of petitioner's sand makes it suitable for glass manufacture.

Petitioner's sand has the crystallographic structure of quartz, and is angular in appearance. This sand resulted from the disintegration of a type of rock formed through the cementation, by a silica cement, of sand grains.

Petitioner claimed a depletion allowance at the rate of 15 per cent, alleging that it mined "quartzite." Respondent disallowed the deduction, substituting in its place the deduction based on the 5 per cent rate allowed "sand."

OPINION.

RAUM, *Judge:* Petitioner's operations entailed the removal of overburden made up of vegetation, soil, and gravel until strata rich in quartz sand were uncovered. The quartz sand occurred in unce-

mented deposits along with clay, granules, pebbles, and cobbles. Petitioner mined these deposits by a process called wet pit mining or dredging. The uncemented materials were extracted with the aid of a motor-driven pump housed in a dredge, and were transported by pipelines to screening stations. Sand which passed through the screens was transported, again by pipelines, to a wash plant where clay and sediment were removed from the sand. After washing, the sand was stored and dried in silos.

Petitioner's sand, washed, and dried at 110° centigrade, is 98.98 per cent silicon dioxide, and has the crystallographic structure of quartz. The sand in the deposits has an angular, as opposed to a rounded, appearance. This sand was suitable for use in glass manufacture, and was, in fact, used primarily for that purpose by ultimate purchasers.

Some of the facts in the above paragraph are founded on testimony based on an analysis of petitioner's sand in 1956. Respondent argues that this testimony counts for little insofar as the years in question are 1951, 1952, and 1953. Our examination of the whole record, especially the testimony of petitioner's general manager and the stipulation, as it concerns the ultimate use of the sand mined during the years in question, convinces us that for our purposes there is no significant difference between the sand analyzed in 1956 and the sand mined in the earlier years.

It cannot be denied that petitioner's business involved sand, but petitioner argues that its sand is "quartzite" within the meaning of section 114 (b) (4) (A) (iii), and it (petitioner) is thereby entitled to a 15 per cent depletion allowance and not the 5 per cent allowance provided for "sand."[1]

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

  (b) BASIS FOR DEPLETION.—

  \*     \*     \*     \*     \*     \*     \*

    (4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

      (A) In General.—The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—

        (i) in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum.

      \*     \*     \*     \*     \*     \*     \*

        (iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone, and potash, 15 per centum, and

      \*     \*     \*     \*     \*     \*     \*

    of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. \* \* \*

Our task then is to construe the relevant sections of the statute. Specifically, we must determine the intention of Congress when it used the words "sand" and "quartzite." It is apparently undisputed that these words were intended by the Congress to have their commonly understood commercial meaning.

Petitioner dealt with the problem of construing the statute as if it were to a large degree a question of fact. It called to the stand a witness learned in geology and petrology who testified with respect to the physical and chemical properties of petitioner's sand and the deposits from which it was mined. This witness also defined "quartzite," and indicated that petitioner's sand came within that definition. However, the construction of the statute is essentially a question of law, and although the witness's testimony may be helpful in explaining the nature of a certain substance, it cannot be binding upon this Court in determining which of two statutory labels Congress meant to use in referring to that substance. Cf. *McCaughn* v. *Hershey Chocolate Co.*, 283 U. S. 488; *Sonn* v. *Magone*, 159 U. S. 417; *Nix* v. *Hedden*, 149 U. S. 304. The Court is not compelled to rely on petitioner's witness in discovering the sense in which Congress used certain words.

Moreover, after hearing and subsequently carefully studying the testimony of petitioner's expert witness we are not satisfied that the reasoning therein is adequate to support the conclusions petitioner draws therefrom. The witness, in answer to a request to define "quartzite," stated:

I would say that the definition which is generally accepted by geologists is that quartzite is a rock composed essentially of quartz, which is formed from a sedimentary sandstone by the introduction of a silica cement. This silica cement is often in crystallographic continuity with the original quartz in the sedimentary rock.

He further testified that this was the generally understood meaning of the word. However, even if one accepts that definition—and it is by no means undisputed, for there appears to be authority for the further requirement that quartzite, in addition, should in general split across the grain rather than around it—his testimony is not satisfying that petitioner's product is commonly or commercially referred to as quartzite. Petitioner's sand represented the result of many thousands, or possibly millions of years of disintegration of large rocks, and even though such rocks may properly be classified in accordance with the witness's definition as quartzite, it does not follow that the resulting sand is likewise known as quartzite notwithstanding that its chemical composition and physical properties (apart from size) may be the same as those associated with the rocks from which the sand was derived. We were far from convinced by his

testimony that such *sand* is in fact commonly or commercially known as and referred to as "quartzite."

Since our task is to seek out the legislative intent in the use of the words "sand" and "quartzite," it is important to examine the materials that were before Congress in the course of its consideration of the legislation, as well as dictionaries and like sources customarily used by courts in determining the common or ordinary meaning of words.

On February 9, 1950, J. Rutledge Hill, Chairman of the Committee on Taxation of the National Sand and Gravel Association, appeared before the Committee on Ways and Means of the House of Representatives. Hearings before the Committee on Ways and Means, House of Representatives, 81st Cong., 2d Sess., Revenue Revision of 1950, p. 310. In the course of arguing for percentage depletion for the industry represented by his organization he submitted a table showing the principal uses of sand, one of which was listed as "glass," and he stated (at p. 311):

Sand and gravel are basic materials, and there is no industry which does not depend on one or both of them in some way. Their principal use is, of course, in concrete, but vast quantities are used for railroad ballast, bituminous construction, foundries, glass manufacture, water filters, and for other purposes * * *. Pure silica sand is the principal constituent of glass. * * *

On the same day a spokesman for refractories allegedly producing 90 per cent of this country's refractory material submitted a statement to the Committee on Ways and Means, beginning at page 449 of the above-cited hearings, that contained the following (at p. 452):

As has been above stated, high grade refractories are made also from quartzite, a hard, dense silica rock * * *.
* * * In Ohio a silica rock which may be regarded as quartzite, since it consists mainly of quartzite pebbles bonded together by fine particles of the same material, is mined and is used for the manufacture of refractories. * * *

At this stage then we have a reference to "silica sand" when referring to the sand used in glass manufacture, and to a hard and dense rock when characterizing quartzite. Moreover, in his appearance on behalf of the sand interests, Mr. Hill stated that sand deposits are nearly always covered with overburden, as in the case of petitioner's deposits, and he described the mining operations as including washing, cleaning, and grading—operations comparable to those carried on by petitioner.

A bill (H. R. 8920, 81st Cong., 2d Sess. sec. 204) containing provisions for a 5 percent depletion allowance in respect of "sand" and a 15 per cent allowance in respect of "quartzite" wass passed by the House of Representatives in 1950, but these provisions (which extended percentage depletion allowances to other natural resources as well) were rejected by the Senate and omitted from the revenue law

enacted in that year. See S. Rept. No. 2375, 81st Cong., 2d Sess., p. 53; Pub. L. No. 814, ch. 994, 81st Cong., 2d Sess.

On March 5, 1951, Mr. Hill again appeared before the Committee on Ways and Means. Hearings before the Committee on Ways and Means, House of Representatives, 82d Cong., 1st Sess., Revenue Revision of 1951, p. 1537. He there requested a 15 per cent depletion allowance for the industry which he represented. The following is quoted from his testimony (at pp. 1539–1545):

I am authorized by the National Industrial Sand Association to say to you that the case which I have made for the sand and gravel industry applies with equal force to the industrial sand industry. Industrial sand is a raw material used principally in the foundry and glass industries, but it also finds employment in many other manufacturing processes.

    \*        \*        \*        \*        \*        \*        \*

For all of these reasons, we ask that sand and gravel and industrial sand be accorded a percentage depletion of 15 percent. \* \* \*

Subsequently the House of Representatives again passed and sent to the Senate a bill with similar provisions (H. R. 4473, 82d Cong., 1st Sess., sec. 304) containing a 5 per cent depletion allowance for "sand" and a 15 per cent depletion allowance for "quartzite." The report of the House Ways and Means Committee stated (H. Rept. No. 586, 82d Cong., 1st Sess., p. 30):

Section 304 of this bill adds to the list of nonmetallic minerals to which percentage depletion is available at a 15% rate, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, perlite, diatomaceous earth, and metallurgical and chemical grade limestones. \* \* \*

The bill \* \* \* sets up a new group of minerals to which percentage depletion is available at the rate of 5 per cent. This group consists of sand, gravel, stone, including pumice, scoria, and slate, brick and tile clay, shale, oyster shell, clam shell, granite, marble and asbestos.

On July 13, 1951, Mr. Hill appeared before the Committee on Finance of the United States Senate. Hearings before the Committee on Finance, United States Senate, 82d Cong., 1st Sess., on H. R. 4473, p. 885. His testimony was similar in its relevant aspects to that given earlier before the House Committee on Ways and Means. Additionally, he stated (at p. 888):

We ask that sand and gravel and industrial sand be accorded a percentage depletion allowance of 15 percent. We ask your committee to join with the Ways and Means Committee and the House of Representatives in recognizing the validity of the application of the principle of percentage depletion to sand and gravel and industrial sand and we ask also that the 5 percent allowance presently incorporated in the bill before you be increased to 15 percent.

The bill in its present form was enacted later that year. Pub. L. 183, ch. 521, 82d Cong., 1st Sess.

We think it fair to conclude from the above that at the time the provisions in issue were under consideration by the Congress and en-

acted into law the spokesman for the industry was of the opinion that all sand, regardless of its use, whether for construction purposes, glass manufacture, or other industrial purposes, was entitled to depletion under those provisions only at the 5 per cent rate. Also, it seems clear that those connected with extracting sand used for glass manufacture allied their interests with the sand and gravel industry rather than with the quartzite-mining industry. And in seeking out the intention of Congress, it is pertinent to take into account the situation that was before it and its committees.

Further evidence of the understanding of the industry, as communicated to Congress, can be found in the 1953 Hearings on General Revenue Revision before the Committee on Ways and Means of the House of Representatives. Mr. Hill, still speaking for the Sand and Gravel Association and the National Industrial Sand Association, requested that the applicable depletion allowance be raised from 5 to 15 per cent. Pp. 2087–2089. Also, a spokesman for the Refractories Institute, testifying on behalf of the "entire refractories industry," stated, at page 2071, that:

High grade silica refractories are made from quartzite, which is a firm compact rock composed of grains of quartz so firmly united that fracture takes place across the grains instead of around them.

If the language of those testifying before the Finance Committee and the Committee on Ways and Means is to be taken as persuasive evidence of common commercial usage it would seem plain that insofar as petitioner mined neither a firm compact rock nor a hard and dense rock it was not mining "quartzite." We would need only to examine the bag of "sand" submitted in this case, as a sample of what petitioner mined, to see that it was exactly that. Moreover, regardless of the underlying accuracy of the language used by those witnesses, the important thing is that they appeared before the committees representing themselves as spokesmen for their industries, and Congress acted undoubtedly with their testimony in mind. Whatever technical or scientific testimony may be given by experts in this Court as to the chemical compōsition or crystallographic arrangement of the substance involved, it seems clear to us that Congress was legislating in the light of the common and familiar distinction between a loose mass of granular material on the one hand and a rock on the other hand. Such common understanding, accepted by the average layman as well as by the industry, furnishes a more persuasive indication of legislative purpose than a scientific analysis of the disputed substance. Cf. *Nix* v. *Hedden*, 149 U. S. 304; *Sonn* v. *Magone*, 159 U. S. 417; *McCaughn* v. *Hershey Chocolate Co.*, 283 U. S. 488.

In addition to the materials explicitly before the congressional committees, it is appropriate to consult dictionaries and other similar standard sources with respect to ordinary usage of words, for we must proceed upon the assumption, unless there are persuasive indications otherwise, that Congress intended the words in question to have their commonly understood commercial meanings.

In Webster's New International Dictionary (2d ed., 1950) quartzite is defined as:

A compact granular rock composed of quartz. It is a metamorphosed sandstone, and the siliceous cement is often so blended with the quartz grains as to give the rock a nearly homogeneous texture.

Sand, on the other hand, is defined as "a loose material consisting of small but easily distinguishable grains (most commonly of quartz), resulting from the disintegration of rocks."

The 1952 edition of the Encyclopedia Brittanica contains the following material relevant to the present problem:

[Quartz] *Occurrence.* * * * Quartz being a mineral very resistant to weathering agencies, it forms the bulk of sands and sandstones; and when the sand grains are cemented together by a later deposit of secondary quartz a rock known as quartzite results. * * *

\* \* \* \* \* \* \*

QUARTZITE, in petrology, a sandstone which by the deposit of crystalline quartz between its grains has been compacted into a solid quartz rock. As distinguished from sandstones, quartzites are free from pores and have a smooth fracture, since when struck with the hammer they break through the sand grains, while in sandstones the fracture passes through the cementing material and the rounded faces of the grains are exposed, giving the broken surface a rough or granular appearance. The conversion of sandstone into quartzite is sometimes the work of percolating water under ordinary conditions. * * * Quartzites are too hard and splintery to be used as building stones to any large extent; they furnish a thin and very barren soil, and because they weather slowly tend to project as hills or mountain masses. (Vol. 18, p. 832)

SAND. If rocks and minerals are broken down by either natural or artificial agencies, the products may be classified as gravels, sands, silts and clays. The term sand is usually applied to the material of diameter ranging from about 1/20 to 2 mm. Although most of the rock-making minerals occurring on the earth's crust are found in sands, only a limited number are met with at all frequently. For several reasons quartz is by far the commonest ingredient; it is abundant in rocks, is comparatively hard and has practically no cleavage so that it is not readily worn down to a fine state. Moreover, it is nearly insoluble in water and does not decompose. * * *

\* \* \* \* \* \* \*

In the pottery, glass-making and silicate (water glass) industries very pure quartzose sands are used in large quantities as a source of silica. Similar sands are required for lining the hearths of acid-steel furnaces and for foundry mixtures. (Vol. 19, p. 934)

"A Glossary of the Mining and Mineral Industry" published as Bull. No. 95 in 1947 by the Bureau of Mines of the Department of the Interior sets forth the following definitions for sand and quartzite:

*Sand.* 1. Separate grains or particles of detrital rock material, easily distinguishable by the unaided eye, but not large enough to be called pebbles; also, a loose mass of such grains, forming an incoherent arenaceous sediment. (La Forge)

*Building sand,* any hard, granular rock material finer than gravel and coarser than dust. The term indicates material comminuted by natural means. Quartz grains generally predominate in natural deposits although such deposits commonly contain many other minerals. *Glass sand,* a sand of medium grain consisting of 98 to 100 per cent of silica ($SiO_2$), used in glass making. Iron oxides should form less than 1 per cent of the mass. * * *

*Quartzite.* A metamorphosed quartz of sandstone, formed by the deposition of secondary silica between the original grains, so that the rock is more firmly cemented and less porous than before and tends to break across the grains (La Forge). Not to be used for vein quartz (Kemp). Called also Quartz-rock, Granular quartz.

See also: Glossary of Geology and Related Science, American Geological Institute (1957); Dictionary of Geological Terms, C. M. Rice (1951); Glossary of Selected Geologic Terms, W. L. Stokes & D. J. Varnes (1955).

These sources indicate that quartzite is not distinguished from sand on the basis of chemical composition or the crystallographic structure of individual grains. It is, however, distinguished by the observable differences between a hard compact rock and unconsolidated granular materials. Moreover, "sand" and "quartzite" are only meaningful as they represent different stages in the ongoing natural processes involving the formation and destruction of rocks. The conclusion is inescapable that "quartzite" and "sand," when given their ordinary meanings, are mutually exclusive. Accordingly, petitioner, admittedly engaged in mining sand, is not entitled to the depletion rate allowed to quartzite. That some of petitioner's sand is used for purposes dependent upon its high quartz content, and that it may be competitive with quartzite does not require a different conclusion. *Virginia Limestone Corporation,* 26 T. C. 553; *Spencer Quarries, Inc.,* 27 T. C. 392. If a reason must be ascribed to the Congress for providing different depletion allowances for two things which may in some cases have similar uses, we need only mention the problem involved in dredging granular materials as opposed to that involved in mining a hard compact rock.

Further confirmation of the commonly understood commercial meaning of the word "sand" is to be found in the corporate name adopted for petitioner. That its name is "South Jersey Sand Company" is some indication that those who controlled its affairs wished to proclaim to the commercial world that it was in the sand business. And

in its 1950 income tax return, with respect to the year prior to the enactment of the statutory provisions in controversy, its business was stated to be "Mining Silica Sand." Not until the filing of the 1951 and 1952 returns was the word "quartzite" added.

Petitioner suggests that its product may be *both* "sand" and "quartzite," and that the more specific category, namely, quartzite should govern. If its major premise were correct, then there would be much force to its conclusion. However, as stated above, we think that these words were used by congress so as to be mutually exclusive, and we are therefore not faced with the choice of selecting one out of two categories, both of which are applicable to the substance in question.

Petitioner directs our attention to the committee reports issued in connection with the 1954 Code in order to find support for its position. Those reports indicate a congressional understanding that under the 1954 law, quartz sand, when sold for purposes dependent upon its chemical or refractory properties, is to be allowed depletion at the 15 per cent rate. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A185, and S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 331–332. But we find them inconclusive as to the meaning which Congress in 1951 intended to impart to the words "quartzite" and "sand." Moreover, in dealing with the very provision of the 1954 Code to which petitioner makes reference, the Senate Finance Committee stated (p. 333) :

Your committee's action on this section applies only to 1954 and future years. No inference can be drawn from the reclassification of certain minerals and other actions as to the meaning of present law.

We hold that the Commissioner did not err in determining that the product mined by petitioner was "sand" rather than "quartzite."

*Decision will be entered under Rule 50.*