W. D. HADEN COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 76898, 78803. Filed December 21, 1961.

*John G. Heard, Esq.*, for the petitioner.
*Harold A. Chamberlain, Esq.*, for the respondent.

514

OPINION.

### Issue 1.

BLACK, *Judge:* The first issue to be decided is whether the Haden Company may claim a depletion deduction on that part of its gross income derived from sales of oystershell to the chemical companies—Dow, Lone Star, and Nyotex—at the depletion rate applicable to calcium carbonates for the taxable years 1951 through 1957. Other questions raised by the pleadings involving depletion have been agreed to by the parties and are no longer in issue. Under the 1939 Code, as amended by section 319(a) of the Revenue Act of 1951, the rate

of depletion applicable to calcium carbonates was 10 percent and the rate applicable to oystershell was 5 percent.[1] Petitioner used the 10 percent figure in computing its depletion deduction for the years 1951, 1952, and 1953 as applied to its gross income from sales to Dow, Nyotex, and Lone Star. Under the 1954 Code, the rate of depletion applicable to calcium carbonates is 15 percent and the rate for oystershell remains at 5 percent.[2] Petitioner again used the higher figure

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.
(b) BASIS FOR DEPLETION.—
(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

    \*        \*        \*        \*        \*        \*        \*

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—
(A) In General.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—
(i) in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum,
(ii) in the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, 10 per centum,
(iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone, and potash, 15 per centum, \* \* \*

[2] SEC. 613. PERCENTAGE DEPLETION.
(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.
(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:
(1) 27½ percent—oil and gas wells.
(2) 23 percent—
(A) sulfur and uranium; and
(B) if from deposits in the United States—anorthosite (to the extent that alumina and aluminum compounds are extracted therefrom), asbestos, bauxite, beryl, celestite, chromite, corundum, fluorspar, graphite, ilmenite, kyanite, mica, olivine, quartz crystals (radio grade), rutile, block steatite, talc, and zircon, and ores of the following metals: antimony, bismuth, cadmium, cobalt, columbian, lead, lithium, manganese, mercury, nickel, platinum and platinum group metals, tantalum, thorium, tin, titanium, tungsten, vanadium, and zinc.
(3) 15 percent—ball clay, bentonite, china clay, sagger clay, metal mines (if paragraph (2)(B) does not apply), rock asphalt, and vermiculite.
(4) 10 percent—asbestos (if paragraph (2)(B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite.
(5) 5 percent—
(A) brick and tile clay, gravel, mollusk shells (including clam shells and oyster shells), peat, pumice, sand, scoria, shale, and stone, except stone described in paragraph 6; and
(B) if from brine wells—bromine, calcium chloride, and magnesium chloride.
(6) 15 percent—all other minerals (including, but not limited to, aplite, barite, borax, calcium carbonates, refractory and fire clay, diatomaceous earth, dolomite, feldspar,

when computing its depletion deduction for the years 1954, 1955, 1956, and 1957 on its gross income derived from sales to Dow, Lone Star, and Nyotex. As to its sales to all other purchasers, petitioner used the 5 percent figure for all the taxable years in question. We are concerned here only with petitioner's application of the 10 and 15 percent rates to part of its gross income.

At the outset of the discussion of the issue involved, we think it is well that we point out that it is not our function to decide upon the reasonableness or the unreasonableness of any particular rate of depletion granted by the statute to various articles produced by mining, drilling, etc. That is a matter for Congress to determine and not for us to decide. Our duty is to determine the rates of depletion fixed by Congress in the applicable statute to any particular product and apply them as Congress has fixed them. That we shall endeavor to do in the instant case.

Petitioner has well established that the mineral it mined off the Texas gulf coast did have a very high calcium carbonate content, perhaps the purest commercial form of calcium carbonate found in the United States. In order to apply the rate of depletion for calcium carbonates to part of its gross income, petitioner argues that it mined both calcium carbonates and oystershell from the Texas gulf bays from the same deposits but its method of mining oystershell sold for calcium carbonates was different from that sold for oystershell, hence it is entitled to the different rates of depletion which it claimed on its returns. We cannot agree with this contention. We think the law and the facts, when all are considered, are to the contrary. We have carefully studied the evidence of record and have found that petitioner mined and sold but one mineral and that mineral was oystershell. Petitioner's showing that it mined the deposits at a slower rate of speed from time to time and thereby obtained a cleaner shell when it mined shells for sale to its chemical purchasers, Dow, Lone Star, and Nyotex, did not change the nature of the mineral. The mineral was oystershell before it was mined from the gulf and remained oystershell after it was loaded into petitioner's barges or when it was delivered to its purchasers. It undoubtedly made the oystershell thus

fullers earth, garnet, gilsonite, granite, limestone, magnesite, magnesium, carbonates, marble, phosphate rock, potash, quartzite, slate, soapstone, stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), thenardite, tripoli, trona, and (if paragraph (2)(B) does not apply) bauxite, beryl, flake graphite, fluorspar, lepidolite, mica, spodumene, and talc, including pyrophyllite), except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), that the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. For purposes of this paragraph, the term "all other minerals" does not include—
    (A) soil, sod, dirt, turf, water, or mosses; or
    (B) minerals from sea water, the air, or similar inexhaustible sources.

treated more usable as calcium carbonate but it still remained oystershell.

When hearings were held on the Revenue Bill of 1950 by the Senate Finance Committee, W. P. Hamblin, director and attorney for the Haden Company, appeared before the committee. His testimony is recorded on pages 703 to 706, inclusive, of the Hearings Before the Senate Finance Committee. The House of Representatives had included in its bill, H.R. 8920, in section 204, oystershell, which was then being mined in the Gulf of Mexico, at a depletion rate of 5 percent. The chairman of the Finance Committee asked Hamblin this question:

The Chairman. Does this tax bill affect you?

Mr. Hamblin. We are trying to get a depletion allowance. We are allowed 5 percent under the bill. * * *

The Senate Finance Committee struck out the section of the bill which applied the various new depletion rates, including those for oystershell, and the Revenue Act of 1950, as it was finally enacted, did not include the new depletion rates. See page 53 of the Finance Committee Report on the Revenue Act of 1950. However, when the Revenue Act of 1951 was enacted, new depletion rates were included and oystershell was granted a depletion rate of 5 percent. In the "Summary of the Provisions of the Revenue Act of 1951, as Agreed to by the Conferees," it is stated on page 31, as follows:

Section 319 of the bill sets up a new group of minerals to which percentage depletion is available at the rate of 5 percent. This rate is extended to the following substances none of which are presently entitled to percentage depletion: sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, *oyster shell*, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine. [Emphasis supplied.]

Thus it is plain that a specific rate of 5 percent was granted to "oyster shell" as such.

We think that it is well established that the names of the various minerals enumerated in the depletion sections of the 1939 Code, as amended, and in the 1954 Code, are intended to have their commonly understood commercial meaning and that in any case, where an item was specifically provided for at a stated rate of percentage allowance, the specific provisions would govern over the general classification. *Spencer Quarries, Inc.*, 27 T.C. 392 (1956), and *United States Pumice Supply Co.*, 36 T.C. 1160 (1961).

We have found that the name of the deposits mined by petitioner was oystershell within the commonly understood commercial meaning of the term. We do not think that the facts in the record would permit any other finding. The term "oyster shell" is the specific name for

all the deposits mined by petitioner even though the more general term calcium carbonates would also identify them.

The testimony at the trial of the instant case was to the effect that the principal sources of commercial calcium carbonates were three: (1) Oystershell, (2) limestone, and (3) marl. Paragraphs (i), (ii), and (iii) were added to section 114(b)(4)(A) of the 1939 Code by section 319(a) of the Revenue Act of 1951. Oystershell is listed in paragraph (i) in the 5 per centum category and calcium carbonates in paragraph (ii) in the 10 per centum category. The Senate Finance Committee stated in its report: "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning."[3] The Conference Report to the House further said:

Under the conference agreement calcium carbonates are granted an allowance of 10 percent, while marble, which is a calcium carbonate, receives 5 percent. It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification.[4]

In *Virginian Limestone Corporation*, 26 T.C. 553 (1956), this legislative history was carefully analyzed and the principles announced therein were applied, and we apply them again to the instant case. Oystershell is the specific name of the mineral which petitioner was mining within the commonly understood commercial meaning of the term. Calcium carbonates is a more general term that can also be used to identify the mineral. See also *Albin C. Halquist*, 33 T.C. 304 (1959), the second point in that case.

In section 613(b)(5) of the 1954 Code, oystershells are included in the category molluskshells (including clamshells and oystershells) in the 5 percent listing. The term calcium carbonates is found in paragraph (6) "15 percent—all other minerals." It is obvious that the specific provision is molluskshells (including clamshells and oystershells) and we hold that the 5 percent depletion rate is applicable for the years 1954, 1955, 1956, and 1957.

Petitioner's argument is, in effect (although it disavows the end use is determinative), that the end use of the product mined controls the rate of depletion applicable. The evidence as to the nature of the uses of the shells made by Dow, Nyotex, and Lone Star shows that these concerns were interested in the high calcium carbonate content of the oystershells purchased from petitioner. However, the end-use test has been expressly rejected by this Court, *Virginian*

[3] S. Rept. No. 781, 82d Cong., 1st Sess., p. 38.
[4] H. Conf. Rept. No. 1213, 82d Cong., 1st Sess., p. 77.

*Limestone Corporation, supra,* and *Spencer Quarries, Inc., supra.* In the *Virginian Limestone Corporation* case we stated that:

We find nothing in the applicable statute, or in its legislative history, which tends to show any intention of Congress that, where a mineral has therein been specifically provided for at a stated rate, such rate may be varied by the Commissioner in accordance with the end use to which the product is put by the taxpayer's customers. An allowance for depletion has been recognized in our revenue laws since 1913, based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit, and that a deduction from gross income should be allowed to compensate for such exhaustion. All of the revenue acts enacted prior to 1954, in which such allowance was provided, speak in terms of the wells, mines, and natural deposits which are subject to the exhaustion, as distinguished from the products therefrom or the uses to which such products may be put by customers.

The provisions of the 1954 Code are substantially the same as section 114(b)(4)(A) of the 1939 Code, as amended, for purposes herein, and we apply the same principles announced in the *Virginian Limestone Corporation* and *Spencer Quarries, Inc.,* cases.

Petitioner cites *Quartzite Stone Co.,* 30 T.C. 511, affd. 273 F. 2d 738 (C.A. 10, 1959). However, we think that in respect to the issue here involved the instant case more closely resembles *South Jersey Sand Co.,* 30 T.C. 360, affd. 267 F. 2d 591 (C.A. 3, 1959), and which is in accord with the result which we have reached herein.

Petitioner herein alleges that the materials are either oystershells or calcium carbonates depending on what use is made of the mineral. This is the type of end-use test we rejected in the *Spencer Quarries* and *Virginian Limestone* cases. The recently decided case in the Ninth Circuit, *Riddell* v. *California Portland Cement Co.,* 297 F. 2d 345 (C.A. 9, 1962), affirming in part the District Court of the Southern District of California, to which petitioner refers in an amended brief, also holds that it is sometimes necessary to apply an end-use test to help determine the common commercial nomenclature of the particular deposit. It was stated therein:

To classify them solely by their end use is one thing—to classify them by their commonly understood commercial meaning is another, even though the latter may be shaped and influenced, in some smaller or larger degree, by the end use.

The Ninth Circuit cited with approval, among other cases, *Virginian Limestone Corporation* and *Spencer Quarries, Inc.,* and held that the District Court could have properly concluded from the evidence of record that the name of the specific mineral was calcium carbonates in the commercial meaning commonly understood in the trade.

In the instant case, even by taking into consideration the commercial uses made of the shell sold to Dow, Nyotex, and Lone Star, we cannot find that the substance which petitioner was mining was calcium carbonates within the meaning of the depletion statute whenever sold

to Dow, Lone Star, and Nyotex, and whenever sold to others was oystershell. The argument that the materials were oystershell at one time and calcium carbonates when mined at a slower rate of speed and cleaned up is not impressive to us. What governs is what was mined and not at what rate of speed it was mined.

In the recent case of *Lehigh Portland Cement Co.* v. *United States*, 198 F. Supp. 877 (1961), the court, among other things, stated as follows:

After these three defeats in the Tax Court, paragraph (b) of the Regulation, § 39.23(m)–5, was amended November 29, 1960, T.D. 6510, 1960–2 Cum. Bull. 458, to read:

(b) For the purpose of identifying the minerals listed in paragraph (a) such minerals shall be given their commonly understood commercial meanings. If a mineral of a taxpayer is within both a specific and a general mineral classification listed in paragraph (a), such mineral shall be considered to fall within the more specific classification. If the name of a mineral listed in paragraph (a) has no commonly understood commercial meaning but the name implies a particular use or uses, such mineral is to be defined in terms of such use or uses. Certain of the minerals listed in paragraph (a) are defined below in accordance with the foregoing criteria set forth in this paragraph:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Calcium carbonates—Miscellaneous limestones and other calcium carbonate rocks (not specifically provided for at a 5 percent or 15 percent rate of percentage allowance) which are used or sold for use for purposes for which the calcium carbonate content is a major requirement. For example, the term "calcium carbonates" includes limestone which is not of chemical or metallurgical grade and which is used or sold for use for cement manufacture or soil treatment. *However, the term "calcium carbonates" does not include any carbonate mineral which is identifiable as dolomite, marble, stone, oyster shells, or clam shells within the commonly understood commercial meaning of those terms.* [Emphasis supplied.]

We think that the part of the amended regulation which is here applicable is the last sentence quoted above which reads as follows:

However, the term "calcium carbonates" does not include any carbonate mineral which is identifiable as dolomite, marble, stone, oyster shells, or clam shells within the commonly understood commercial meaning of those terms.

In the *Lehigh Portland Cement Co.* case the United States District Court held that the product which the taxpayer was mining was chemical limestone within the meaning of the statute notwithstanding the amended regulation which defined chemical limestone as "Limestone which contains a calcium carbonate and magnesium carbonate content totaling 95 percent or higher by weight." The court held that the regulation as to its definition of chemical limestone was invalid, was beyond the power of the Commissioner to make, and, therefore, that part of the regulation was invalid. The court, however, said

nothing about the part of the amended regulation which we have quoted above. We see no reason to hold it invalid. Certainly, if it is a valid interpretation of the statute, petitioner is only entitled to a depletion rate of 5 percent on all of its gross income from its mining operations, and not a depletion rate of 10 percent under the 1939 Code, and 15 percent under the 1954 Code, on part of its gross income, as it claimed on its returns and still contends.

We, therefore, hold that petitioner is only entitled to the 5 percent depletion rate for oystershell which the Commissioner has allowed.

*Issue 2.*

The second issue to be decided is whether the amounts paid by petitioner to Edgar are deductible as ordinary and necessary business expenses. Petitioner relies upon section 23(a)(1)(A) of the 1939 Code for deduction of the amounts paid to Edgar prior to 1954. That section reads as follows:

In computing net income there shall be allowed as deductions:
(a) EXPENSES.—
  (1) TRADE OR BUSINESS EXPENSES.—
    (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including services actually rendered; * * *

Petitioner relies upon section 162(a)(1) of the 1954 Code for deduction of the amounts paid to Edgar in 1954, 1955, and 1956. That section reads as follows:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
  (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

After a careful study of the record, we are unable to see where Edgar rendered to petitioner any services. While it is true that he was placed on the payroll and for several years was paid a monthly payment of considerable size, it was not to compensate him for any services that he had rendered to petitioner. The so-called employment contract which was entered into by petitioner and Edgar provided that Edgar should: (1) Not hold himself out as a representative of petitioner, (2) not make sales for petitioner, (3) not make contracts for petitioner, (4) not have an office with petitioner, (5) not indicate he was employed by petitioner, (6) not visit petitioner's premises except if requested by the board of directors or by the president of the Haden Company, and (7) not perform any services for petitioner as consultant and adviser unless called upon to do so

by the board of directors. These, in our opinion, are all negative things and when the statute says that payments made for "services actually rendered" shall be deductible as ordinary and necessary expenses, it means something done which is much more positive than what is stated above.

It seems quite evident to us that Edgar was placed upon the payroll to satisfy his mother, the widow of W. D. Haden, founder of the business, and that it was never contemplated that he render any actual services of any kind to petitioner. Therefore, we do not think that the amounts in question are allowable as deductions for ordinary and necessary business expenses under the respective statutes which we have quoted above. We so hold.

But petitioner argues that the amounts paid Edgar, if not deductible as payments made for services actually rendered to petitioner, are deductible as payments made to him not to compete. If any of the amounts paid to Edgar by petitioner were made to him because of any covenant not to compete, it seems reasonable to assume that some mention of this further element would be expressed in the agreement. Edgar had not been active in business since the early years of World War II. By 1952, the Haden Company was very well established in its field and it is difficult for us to see, in the absence of more compelling reasons, how Edgar was a competitive threat to petitioner. The written contract between petitioner and Edgar is silent as to matters of competition. The minutes of the board of directors meeting held on January 8, 1952, give no indication that petitioner contemplated entering into an agreement to alleviate a threat of competition. While the testimony of petitioner's president, Cecil R. Haden, is to the contrary, we find that the weight of the evidence supports the conclusion that petitioner and Edgar did not enter into an agreement wherein there was a promise not to compete. As a matter of contract law, naked covenants not to compete have been held unenforcible as against public policy but covenants limited in time and geographic area are enforcible. The tax problems involving limited covenants not to compete usually result in connection with the sale of a business, and the tax questions are one of cost allocation. In the present case, however, it is clearly apparent to us that there was no covenant not to compete.

Therefore, we do not consider that we have any issue before us concerning any amounts paid to Edgar because of covenants not to compete.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*