ROTH PROPERTIES COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Roth Properties Co. v. Commissioner
Docket No. 5908-71
United States Tax Court
T.C. Memo 1974-23; 1974 Tax Ct. Memo LEXIS 298; 33 T.C.M. (CCH) 104; T.C.M. (RIA) 74023; January 29, 1974, Filed. Bennet Kleinman, for the petitioner.
Buckley D. Sowards, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION
TANNENWALD, Judge: Respondent *301 determined the following deficiencies in petitioner's income taxes: 2 Taxable year ended November 30 [1] -
Deficiency 1965
$16,102.49
1966
16,128.34
1967
15,149.71
1968
39,529.82
The issues remaining for decision are whether petitioner is liable for the accumulated earnings tax under section 531 [2] for its taxable years 1965 through 1968 and whether the amounts petitioner paid its officers-stockholders during those years were reasonable compensation for services rendered so as to be deductible under section 162(a) (1).
FINDINGS OF FACT
Some of the facts have been stipulated and are so found.
Roth Properties Company (hereinafter referred to as the petitioner) is an Ohio corporation organized in 1952 and had its principal place of business in Cleveland, Ohio, at the time it filed its petition in this case. 3 It filed Federal income tax returns for its taxable years 1965 through 1968, using the accrual method of accounting, *302 with the district director of internal revenue, Cleveland, Ohio.
Roth Steel Products Company (hereinafter Roth Products) is a corporation organized in 1947 and engaged in the manufacture of steel tubing. Roth Steel Tube Company (hereinafter Roth Tube) is a corporation organized in 1956 and engaged in the business of selling the products of Roth Products.
The capital stock of the three corporations was originally owned as follows: Roth Products
Roth Tube
Petitioner
Shares
Percent
Shares
Percent
Shares
Percent Irving Roth
250
100
125
50
70
28
Libby Roth
60
24
Leonard Roth
125
50
60
24
Phyllis Weiss
60
24
Totals
250
100
250
100
250
100
Leonard Roth and Phyllis Weiss are the children of Irving and Libby Roth. Irving died in 1961. Prior to the final distribution of his estate on October 15, 1965, Roth Products redeemed from Irving's estate 77 shares of 4 its stock. After that date, the stock of the three corporations was owned as follows: Roth Products
Roth Tube
Petitioner
Shares
Percent
Shares
Percent
Shares
Percent Libby
117
68
85
34
108
43.2
Leonard
28
16
145
58
71
28.4
Phyllis
28
16
20
8
71
28.4
Totals
173
100
250
100
250
100.0
*303 Petitioner's principal asset consisted of approximately 6 acres in Cleveland, Ohio, and the buildings situated thereon, which had some 110,000 square feet of floor space. This property was leased by petitioner to Roth Products and Roth Tube for use as their manufacturing plant, offices, outside storage area, and parking space. Leasing this property was petitioner's only business and Roth Products and Roth Tube were petitioner's only tenants during its taxable years 1965 through 1968.
Roth Products and Roth Tube experienced substantial growth in their output and sales. Throughout the 1960's, petitioner attempted to locate and acquire suitable additional property adjacent to its own or in the nearby 5 vicinity to provide for the future expansion needs of its tenants. In this connection, petitioner obtained two appraisals of an adjacent property, one in the amount of $44,000 (dated October 4, 1961) and one in the amount of $77,500 (dated January 6, 1968).
The minutes of the annual meeting of petitioner's board of directors, held on November 25, 1966, contained the following:
The President advised the Board that the Company was seeking to purchase land adjacent to its present *304 real estate holdings. It was pointed out that the present tenant of the property stated that the present facilities had been utilized to the maximum capacity and additional warehouse space would be needed.
After some discussion the following resolution was thereupon adopted:
RESOLVED: That the corporation provide out of earnings and surplus the necessary funds up to $100,000. to purchase the adjacent property if it is available for sale.
Petitioner's efforts to obtain the adjacent property were unsuccessful because petitioner was unwilling to pay the price which the owner demanded and which was substantially in excess of the appraised value both in 1961 and 1968.
The minutes of the annual meeting of petitioner's board of directors held on November 24, 1967, contain the following: 6 The President advised the Board that the company was contemplating replacing the south end of the office building at 1335 East 171 St. in the near future. Additionally he advised that the north end of the existing building would require major renovating.
After some discussion the following resolution was thereupon adopted:
RESOLVED: That the Corporation provide out of earnings and surplus the *305 necessary funds up to $75,000. to replace the existing structure at the south end of the building located at 1335 East 171 St. and to renovate the north end of the building.
The President advised the Board that the Company was still seeking suitable land for expansion.
In May 1968, petitioner and its tenants obtained from a building contractor specific and detailed proposals for the construction of a new manufacturing plant, with 161,400 square feet of floor space, and office building, with 3,600 square feet of floor space, at an industrial development location in Eastlake, Ohio. The contractor's proposed maximum price for this plant and office building was $1,167,000 and an additional $140,000 if the manufacturing area was to be airconditioned. At the same time, Roth Products obtained cost estimates of the utilities, maintenance machinery, and production equipment that it would need for its operations at the proposed new plant. In June 1968, Roth Tube began negotiations to acquire the stock of 7 Toledo Steel Tube Company of Toledo, Ohio, which was engaged in a business similar to that of Roth Products and Roth Tube and had a 150,000 square-foot plant and about 40 acres of *306 land. Roth Tube acquired the stock of Toledo Steel Tube Company on November 1, 1968. This acquisition satisfied the current expansion plans of Roth Products and Roth Tube and obviated the need for the proposed new plant and office building. In October 1968, petitioner acquired for $10,542.35 a small parcel of land that was adjacent to the parking lot on petitioner's existing property, demolished the house located thereon, and enlarged the parking lot in order to accommodate the needs of its two tenants for additional parking space.
The minutes of the annual meeting of petitioner's board of directors on November 18, 1968, contain the following:
The President announced that it would be advisable at this time to take up the matter of a dividend for the current year.
Some discussion was then had with regard to the availability of funds to pay the dividend, and the President pointed out that negotiations have been carried on with various contractors to reconstruct the office building, and in fact, to get some bids for such construction. He pointed out also that it appeared that the price originally contemplated 8 would be much higher, and that the construction would probably *307 run in excess of $150,000.00.
In view of these facts, and the fact that there would undoubtedly be required other repairs, maintenance construction and perhaps the acquisition of other properties, it might be well to retain the funds in the corporation rather than pay them out in large dividends.
The President further pointed out that there had been acquired additional land at a cost of $10,500.00.
From December 1969 through April 1971, petitioner spent $113,620 for the replacement of the south end of the office building on its property and the renovation of the north end of that building, as was previously planned. This construction and renovation satisfied the current needs of petitioner's tenants for new office facilities.
At the close of each taxable year involved herein, petitioner's financial position (as reported on its Federal income tax returns for those years) was as follows: 9 Fiscal year ended November 30 -
1965
1966
1967
1968 ASSETS
Cash [3]
$ 9,526.59
$166,927.73
$221,967.33
$271,659.77
Notes and Accounts Receivable
99,273.57
1,458.31
-0-
-0-
Prepaid Insurance
312.82
295.00
652.20
286.27
Fixed Assets (Less: Accumulated depreciation)
245,721.17
228,291.86
213,654.00
197,399.04
Land
19,200.00
19,200.00
19,200.00
29,917.35
Total Assets
$373,998.15
$416,172.90
$455,473.53
$499,262.43
LIABILITIES AND CAPITAL
Current Liabilities
$ 28,296.12
$ 28,981.44
$ 26,919.50
$ 32,393.17
Common Stock
100,000.00
100,000.00
100,000.00
100,000.00
Retained Earnings
245,702.03
287,191.46
328.554.03
366,869.26
Total Liabilities and Capital
$373,998.15
$416,172.90
$455,473.53
$499,262.43
*308 10 Petitioner's gross income consisted exclusively of interest and rents. Its net income after taxes and the amount of dividends paid as reported on its tax returns for the years indicated were as follows: Year
Net Income
Dividends Paid 1965
$39,731.34
$500.00
1966
41,989.43
500.00
1967
41,862.57
500.00
1968
43,807.23
500.00
If petitioner's current income in excess of dividends paid had been distributed among its shareholders rather than being allowed to accumulate in the corporation, their additional Federal income tax liability resulting from such *309 distributions would have been as follows: [4] Undistributed Income Prorated
1965
1966
1967 Libby
$16,947.94
$17,923.43
$ 17,868.63
Leonard
11,141.70
11,783.00
11,746.97
Phyllis
11,141.70
11,783.00
11,746.97
Totals
$39,231.34
$41,489.43
$41,362.57
Federal Income Tax Avoided
1965
1966
1967
Libby
$ 8,019.24
$ 6,821.07
$ 6,793.91
Leonard
5,332.58
6,264.61
5,571.70
Phyllis
3,557.99
3,818.70
4,013.83
Totals
$16,909.81
$16,904.38
$16,379.44 11 During the taxable years in issue, petitioner paid the following amounts to its president, Leonard Roth, and to its secretary-treasurer, Phyllis Weiss, and deducted them for Federal income tax purposes as compensation paid to its officers: Taxable year
1965
1966
1967
1968 Leonard
$6,000
$6,000
$6,000
$6,000
Phyllis
3,000
1,250
-0-
-0-
Petitioner had no other employees during those years. *310 In his capacity as president of petitioner, Leonard conducted all of that corporation's affairs. Petitioner's tenants were responsible for the routine maintenance and repair of the leased premises, payment of real estate taxes, and obtaining public liability insurance. Whatever else remained to be done concerning the property on behalf of petitioner, such as inspecting the property, 12 arranging for additional construction and major repairs, and negotiating insurance claims was done by Leonard. He also made efforts on behalf of petitioner to satisfy the expansion needs of its tenants, by searching for suitable additional property adjacent to petitioner's existing property or in the nearby vicinity, obtaining appraisals of such property, and negotiating for its acquisition on terms acceptable to petitioner. Leonard represented petitioner in its negotiations with the building contractor for the construction of the proposed new factory and office building. He also was responsible for maintaining petitioner's books and records, filing its state and Federal tax returns, and conducting the annual meetings of petitioner's board of directors.
Leonard established the amount of his *311 salary after consulting petitioner's attorney and accountant and on the basis of what it would have cost petitioner to obtain the same services from someone else. Leonard was familiar with the salaries payable for similar services as a result of his experience in hiring employees for Roth Products and Roth Tube.
Leonard Roth was also the president of Roth Products and Roth Tube throughout the years in issue. 13 Phyllis Weiss was the secretary-treasurer and a director of petitioner during the years in issue. In those capacities, she attended the annual meetings of petitioner's board of directors, attested the corporate minutes, was authorized and available to sign checks on behalf of petitioner, and was available for conferring with Leonard about the corporation's affairs.
On February 24, 1971, in accordance with the provisions of section 534(b), respondent sent by certified mail a notification informing petitioner that he proposed to issue a notice of deficiency in regard to petitioner's taxable years 1965 through 1967 setting forth amounts with respect to the accumulated earnings tax imposed by section 531. Petitioner did not submit a statement pursuant to section 534(c). *312 On May 27, 1971, respondent sent petitioner a notice of deficiency in regard to its taxable years 1965 through 1968. Respondent determined therein that petitioner was liable for the accumulated earnings tax for its taxable years 1965 through 1967 and was liable for the personal holding company tax for its taxable year 1968. Respondent also disallowed amounts deducted by petitioner as compensation paid to Leonard Roth and Phyllis Weiss. 14 By amendment to his answer herein, respondent further alleged, in the alternative, [5] that petitioner was liable for the accumulated earnings tax for its taxable year 1968. After the trial and filing of briefs in this case, respondent conceded that petitioner was not subject to the personal holding company tax for its taxable year 1968.
ULTIMATE FINDINGS OF FACT
Petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders for each of its taxable years 1965, 1966, 1967, and 1968.
Reasonable compensation of petitioner's president *313 was $6,000 in each of the taxable years 1965, 1966, 1967, and 1968 and zero for its secretary-treasurer for the taxable years 1965 and 1966.
OPINION
Issue 1. Accumulated Earnings Tax The first issue to be decided is whether the petitioner is liable for the accumulated earnings tax for its taxable years 1965 through 1968. Section 531 imposes the accumulated 15 earnings tax on the accumualted taxable income of a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Section 533(a) provides that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." The term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Section 537(a) (1).
We deal first with the taxable years 1965, 1966, and 1967. Respondent asserts that petitioner had permitted *314 its earnings and profits for those years to accumulate beyond the reasonable needs of its business. The burden of disproving that assertion and thereby avoiding the presumption of section 533(a) rests on the petitioner, since it has not attempted to shift that burden to respondent in accordance with section 534(a) (2).
The record herein as to the reasonable needs of petitioner's business is extremely barren, almost to the point of nonexistence, consisting almost entirely of vague, 16 general testimony of petitioner's president and the recitals from the minutes of the meetings of petitioner's board of directors as set forth in our findings of fact. We have serious doubts whether such nebulous evidence meets the normal requirements of specificity demanded by the decided cases, even taking into account our reluctance to substitute our business judgment for that of corporate management as to what constitutes the reasonable needs of a business. Cf., e.g., GPD, Inc., 60 T.C. 480 (1973). Certainly, the degree of specificity revealed herein is a far cry from that involved in Magic Mart, Inc., 51 T.C. 775 (1969); Faber Cement Block Co., 50 T.C. 317 (1968). *315 But we find it unnecessary to delve further into this aspect of the case because, taking the view of the record herein most favorable to petitioner, we think petitioner has utterly failed to sustain its burden of proof for 1965, 1966, and 1967.
With respect to 1965, petitioner was apparently attempting to acquire additional property for the use of its tenants. But all that appears in the record is that there was a parcel adjacent to petitioner's premises in which petitioner had some interest which was appraised at some $44,000 and which could not be purchased. Also, by the end of 1965, petitioner had an excess of current assets over current liabilities of over $80,000 with which to acquire such property if such acquisition proved possible - an amount 17 substantially in excess of the appraised value.
The same situation existed in 1966. Even if we accept the amount of $100,000 set forth in the November 25, 1966 minutes as proof of needs of the business, petitioner had an excess of current assets over current liabilities of some $139,000 at the end of that year.
By the end of 1967, petitioner's excess of current assets over current liabilities was more than $195,000, and its *316 needs, assuming we accept the board minutes as proof thereof, were at most $175,000 - $100,000 from 1966 and an additional $75,000 specified in the minutes of the November 24, 1967 meeting.
With respect to 1968, we have a somewhat different situation. Respondent first raised the issue of the accumulated earnings tax for that year in an amendment to his answer. Therefore, the burden of proving in respect to that year that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business rests on him. Nemours Corporation, 38 T.C. 585, 598-599 (1962), affirmed per curiam 325 F.2d 559, 560 (C.A. 3, 1963). See section 534(a) (1) and Rule 142, Tax Court Rules of Practice and Procedure.
Our findings indicate that, during 1968, petitioner sought to develop plans for the construction of a new 18 office building and industrial plant at a cost in excess of one million dollars. Those plans were abandoned during the same year, however, and therefore may not be considered as a factor in determining petitioner's reasonable business needs. Indeed, the acquisition of Toledo Steel Tube Company by Roth Tube on November 1, 1968, satisfied *317 the current expansion needs of petitioner's two tenants.
The minutes of the 1968 meeting of petitioner's board of directors state that the anticipated cost of renovating the office building would be more than $150,000 and therefore the board thought it advisable to accumulate the corporation's earnings rather than pay them out in larger dividends. Even if we were to consider such estimate as the reasonably anticipated cost of the renovation plans, [6] that amount is considerably less than the amount of petitioner's available assets (i.e., excess of current assets over current liabilities) at the close of 1968 ($239,552.87). We, therefore, find that respondent has shown that petitioner permitted its earnings in 1968 to accumulate beyond the reasonable needs of its business. 19 Because we have found as to each year that petitioner permitted its earnings to accumulate beyond the reasonable needs of its business, the presumption of section 533(a) is determinative, since petitioner has failed to introduce any evidence which would negate the existence of the *318 proscribed purpose specified in section 532(a). The burden of proof as to the absence of such purpose is shifted to the petitioner even with respect to 1968. See Nemours Corporation, supra.Compare Alex Brown, Inc., 60 T.C. 364 (1973), on appeal (C.A. 6, Aug. 16, 1973). Accordingly, we hold that petitioner is liable for the accumulated earnings tax for its taxable years 1965 through 1968.
In view of our conclusion, we need not consider respondent's further contention that petitioner was a "mere holding company", within the meaning of section 533(b) during the taxable years in issue. Nor do we need to explore the question of whether the business needs of a sister corporation may be taken into account in determining whether a taxpayer corporation has unreasonably accumulated its earnings - an issue which has not been raised by respondent. [7] 20 Issue 2. Reasonable Compensation The next issue to be decided is whether petitioner is entitled to deduct the amounts it paid as compensation to its officer-stockholders *319 during its taxable years 1965 through 1968. Section 162(a) (1) limits the deduction to "a reasonable allowance * * * for personal services actually rendered." The question of how much compensation is reasonable for a particular employee is one of fact, and the burden of proof is on the taxpayer. Since it would be to the tax advantage of a corporation to characterize payments to its shareholders as deductible compensation rather than dividends, the reasonableness of purported compensation most often becomes the subject of scrutiny when the corporation is closely held and the officer-stockholder to whom the payment is made controls the corporation's affairs. Botany Worsted Mills v. United States, 278 U.S. 282, 292-293 (1929); Dielectric Materials Co., 57 T.C. 587, 591 (1972); section 1.162-7, Income Tax Regs.
Petitioner paid its president, Leonard Roth, compensation of $6,000 in each of its taxable years 1965 through 1968, of which respondent disallowed all but $1,000 for each year.
We find that petitioner has sustained the burden of proving the reasonableness of the compensation paid to 21 Leonard Roth. While the only evidence offered on this issue *320 by petitioner was the testimony of Leonard himself, we found him to be a candid and credible witness. He described the services he performed on behalf of petitioner and the manner in which his compensation was established, as set forth in our findings of fact.
Respondent argues that Leonard's activities in connection with the leased property and the search for suitable new property were performed more on behalf of the two tenants, Roth Products and Roth Tube, than on behalf of petitioner. Leonard readily admitted that it was not always outwardly apparent or clear in his own mind on which corporation's behalf he was acting at any one time. When the same officer-stockholder manages the affairs of related corporations engaged in related businesses, the need for such role discrimination is more conceptual than practical in most instances. At any rate, the record in this case satisfies us that Leonard's activities in connection with the leased property and search for suitable new property were performed primarily in furtherance of petitioner's business as a lessor and benefited Roth Products and Roth Tube only incidentally 22 through their lessee relationship to the petitioner. *321 [8]
Petitioner paid its secretary-treasurer, Phyllis Weiss, compensation of $3,000 during its taxable year 1965 and $1,250 during its taxable year 1966, all of which respondent has disallowed.
Petitioner did not pay Phyllis any compensation during its taxable years 1967 and 1968. No explanation was offered with respect to the different amounts of compensation paid to Phyllis over the years involved. The only evidence offered by petitioner on this issue was the testimony of Leonard. He testified that, as an officer and director of petitioner, Phyllis attended the annual meetings of petitioner's board of directors, attested the corporate minutes, was authorized and available to sign checks on behalf of petitioner, and was available for conferring with Leonard about the corporation's affairs.
There is no evidence that Phyllis ever exercised her authority to sign checks or that she ever did confer with Leonard about petitioner's affairs. Insofar as the record indicates, the only services actually rendered by Phyllis *322 23 were her attendance at the annual meetings of petitioner's board of directors and her attestation of the corporation minutes, and we consider these services to have been pro forma only and their value de minimis. Langley Park Apartments, Sec. C, Inc., 44 T.C. 474, 484 (1965), affirmed per curiam 359 F.2d 427 (C.A. 4, 1966).
Although the amounts of compensation paid to Phyllis were relatively small, section 162(a) (1) authorizes a deduction of compensation only when it is paid for "services actually rendered." If the taxpayer has received no valuable services in return for the payment, the deduction must be disallowed. Langley Park Apartments, Sec. C, Inc., supra. See also W. D. Haden Co., 37 T.C. 512, 525-526 (1961), affd. 321 F.2d 169 (C.A. 5, 1963). We hold that petitioner has failed to sustain its burden of proof as to the amounts paid to Phyllis.
We conclude that petitioner is entitled to deduct all of the compensation paid to Leonard Roth during its taxable years 1965 through 1968 and none of the amounts paid to Phyllis Weiss during its taxable years 1965 and 1966.
Decision will be entered under Rule *323 155. Footnotes
1. Petitioner's taxable years ending November 30 will be denoted by the calendar years in which they end.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. There is no evidence in the record regarding the composition of this item. The record does indicate, however, that petitioner's rent receivable account had a balance of zero at the close of its fiscal years 1967 and 1968. The record does not disclose the balance of that account at the close of petitioner's fiscal years 1965 and 1966. On the basis of the foregoing and the almost exclusive source of petitioner's income, we infer that petitioner's receivable balances at the close of 1965 and 1966 consisted at least for the most part of rents receivable from Roth Products and Roth Tube. ↩
4. The parties have stipulated the amounts of tax avoided by the shareholders with respect to petitioner's taxable years 1965 through 1967 but have offered no evidence as to such amounts with respect to petitioner's taxable year 1968. ↩
5. Section 532(b) provides that "the accumulated earnings tax imposed by section 531 shall not apply to * * * a personal holding company (as defined in section 542)."↩
6. The actual cost of the work done on the office building, completed some two and a half years later, was $113,620. ↩
7. In this connection, we note that the record herein is devoid of any evidence as to the financial condition of either Roth Products or Roth Tube. ↩
8. Compare Walkup Co., a Memorandum Opinion of this Court dated February 20, 1948, with Amco Inv. Co., a Memorandum Opinion of this Court dated March 13, 1945.↩