**W. D. HADEN COMPANY, Petitioner,**
**v.**
**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent.**

No. 20091.

United States Court of Appeals
Fifth Circuit.

July 26, 1963.

Rehearing Denied Aug. 29, 1963.

John G. Heard, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel., Int. Rev. Serv., John M. Morawski, Atty., Int. Rev. Serv., Melva M. Graney, Robert L. Waters, Edward S. Smith, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HUTCHESON and GEWIN, Circuit Judges, and CONNALLY, District Judge.

HUTCHESON, Circuit Judge.

This appeal by the taxpayer from an adverse decision of the Tax Court, reported at 37 T.C. 512, presents two questions for our determination: (1) whether the Tax Court erred in finding that part of a deposit mined and sold by the appellant was, for purposes of depletion, oyster shell, rather than calcium carbonate; and (2) whether the Tax Court erred in holding that the taxpayer is not entitled to deduct, as ordinary and necessary business expenses, amounts paid to Edgar Haden, pursuant to an employment contract.

We consider first the percentage depletion to which the taxpayer is entitled on the product mined by him during the years in question (1951–1957). The underlying facts are substantially undisputed; indeed, many are stipulated. The appellant has, for many years, been in the business of mining and then selling, mineral deposits located in Galveston Bay and Trinity Bay on the Texas Gulf Coast. While those deposits, because of their physical characteristics, may be, and are, classified as oyster shell, they, nevertheless, consist chemically of ninety-seven to over ninety-eight percent calcium carbonate.[1]

The deposits mined by the appellant were sold to two groups of customers for two different purposes. Chemical companies[2] purchased the product solely because of, and in order to utilize, the calcium carbonate content, for the purpose of producing cement, quicklime, and lime.[3] The balance of the product was sold to customers who used the material to utilize its physical, rather than chemical, properties, for such purposes as building roads, as aggregate in concrete, and as ballast. That part of the deposits which was to be sold to the chemical customers was mined at a slower rate of speed, so that a cleaner shell was available, with the result that the shell was more usable as calcium carbonate.

The Internal Revenue Code of 1939 and 1954 permit a taxpayer to claim a higher percentage depletion for calcium carbonate than for oyster shell. Calcium carbonate is depletable at a rate of ten percent under the 1939 Code, I.R.C.1939, Sec. 114(b) (4) (A) (ii), and fifteen percent under the 1954 Code, I.R.C.1954, Sec. 613(b) (6), whereas oyster shell is depletable at a rate of only five percent under both Codes, I.R.C.1939, Sec. 114 (b) (4) (A) (i); I.R.C.1954, Sec. 613 (b) (5). While conceding that, as to that portion of the deposits which was sold for non-chemical uses, it is entitled only to the percentage depletion for oyster shell, the appellant contends that, as to that portion which was sold for chemical uses, the produce is, for depletion purposes, calcium carbonates. Thus, it is contended that the appellant was mining *two* minerals from one deposit: oyster shell and calcium carbonate. The government contends, and the Tax Court held, that the appellant was mining and selling only one produce: oyster shell.

The only issue before us is whether the finding that that part of the deposit which was sold for chemical purposes was oyster shell, rather than calcium carbonate, is clearly erroneous.[4] Rid-

1. The record and the opinion below show that the three principal sources of calcium carbonate are oyster shell, limestone, and marl.

2. Nyotex Chemicals, Inc., Lone Star Cement Co., and Dow Chemical Co.

3. Because the deposits were sold and used for these purposes, no issue is raised as to the limitation of I.R.C.1954, Sec. 613 (b) (6), under which the depletion allowance for certain minerals, including calcium carbonate, is reduced from fifteen percent to five percent when the mineral is used for non-chemical purposes.

4. The decision in Rock Hill Quarries Co. v. United States, D.C.E.D.Mo., 1963, 217 F.Supp. 324, is, therefore, inapposite here. The district court there found that the taxpayer's product was calcium carbonate, rather than limestone, as urged by the taxpayer, or stone, as argued by the government. The function of the dis-

dell v. Victorville Lime Rock Co., 9th Cir., 1961, 292 F.2d 427; United States v. Wagner Quarries Co., 6th Cir., 1958, 260 F.2d 907. The applicable legal principles are clear and were, we think, correctly applied below. In determining the classification of a particular mineral for purposes of depletion, "[t]he test adopted by Congress and approved by the courts is whether the product meets the commonly understood commercial meaning of the substance in respect to which the depletion was granted." H. Frazier Co. v. United States, Ct.Cl., 1962, 302 F.2d 521, 524; Riddell v. Victorville Lime Rock Co., supra; United States v. W. R. Bonsal Co., 4th Cir., 1960, 279 F.2d 465; Commissioner v. Quartzite Stone Co., 10th Cir., 1959, 273 F.2d 738.[5]

■ Further, the principle is clearly established that, where a particular mineral is subject to either of two commercial designations, the specific classification will control over the general one. E.g., United States Pumice Supply Co. v. Commissioner, 9th Cir., 1962, 308 F.2d 766; United States v. W. R. Bonsal Co., supra; Virginian Limestone Corp., 1956, 26 T.C. 553.[6]

■ Much of the evidence adduced by the taxpayer was to the effect that oyster shell is composed principally of calcium carbonate.[7] It is evident that there was never dispute on this point. It is similarly clear that there is no such thing as pure calcium carbonate in commercial quantities in this country.[8] The record further demonstrates that the deposits here in question were purchased by customers solely because of the calcium carbonate content and were mined with that end in view. Insofar as these factors were relevant, however, they were relevant only insofar as they bore on the commercial designation of the deposits.

But, on that, the ultimate fact issue, the evidence shows, at most, that "oyster shell" and "calcium carbonate", as commercial terms, were applied interchangeably to the entire deposit, including that portion ultimately used for chemical purposes. W. H. Tilley, chief chemist for Lone Star Cement Company, another of the appellant's chemical customers, testified to the same effect. In short, the evidence certainly did not compel the Tax Court to infer that the commercial meaning of the product was calcium carbonate, and, conversely, the finding that it was oyster shell finds ample support in the record.

■ Even conceding, moreover, that under the commercial meaning test, as applied to the evidence, the product could be characterized as either oyster shell or calcium carbonate, that is, that it bore two commercial meanings, we think that the conclusion that it was oyster shell, rather than calcium carbonate, was compelled by the evidence. We think it manifest that the term "oyster shell" is more

trict court there was of course, to make the ultimate finding as to the definition of the taxpayer's product, whereas we are concerned only with whether the ultimate finding of the Tax Court in the present case was clearly erroneous.

5. "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." S.Rep. No. 781, 82d Cong., 1st Sess., p. 38, U.S.Code Congressional and Administrative News 1951, p. 2008.

6. As Bonsal shows, that proposition may work in favor of the taxpayer as well as the government. There, the taxpayer's product was held to be the more specific mineral, quartzite, rather than sand and gravel, thus qualifying for a depletion rate of fifteen percent rather than five percent.

7. For example, Virgil Jackson, chief chemist for Southwestern Laboratories, testified on the basis of experiments, that the percentage of calcium carbonate in the oyster shells was 98.28. Dr. John Adams, professor of geology at Rice University, testified that, as among the minerals containing calcium carbonate, oyster shell was the purest form.

8. Dr. Adams testified that technical grade calcium carbonate, which is perhaps 99.-44 percent pure, can be found naturally, and he further stated: "But to find any —to find a hundred or two tons of it, that would be quite a problem."

specific than the term "calcium carbonate", so that, for depletion purposes, it must be applied to the product in question.[9] Calcium carbonate is a chemical compound, taking the form of several specific minerals; all oyster shell is composed of calcium carbonate, but oyster shell is not the sole commercial source of calcium carbonate. Indeed, the Conference Report, speaking to this distinction, stated:

"Under the conference agreement calcium carbonates are granted an allowance of 10 percent, while marble, which is a calcium carbonate, receives 5 percent. It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification." H. Conference Report No. 1213, 82d Cong., 1st Sess., U.S. Code Congressional and Administrative News 1951, p. 2133.

Thus, when the statute speaks of calcium carbonates, it refers, we think, to a more general group of minerals, and where, therefore, the particular deposit is susceptible, by commercial designation, to a more specific classification, and that classification is used in the statute, as "oyster shells" is, the latter will control.

While conceding, as it must, that the end-use of a particular mineral deposit is not determinative of its classification, the taxpayer contends that, nevertheless, it is relevant in determining the commercial meaning of the product, Riddell v. California Portland Cement Co., 9th Cir., 1962, 297 F.2d 345.[10] that the Tax Court failed to take the use of that part of the deposit mined and sold for its

chemical content into consideration, and that, when that use is considered, that part of the deposit must be commercially classified as calcium carbonate rather than oyster shell. The taxpayer's concession of the rule, when viewed in light of all of the evidence, does not obviate the evident fact that it is, in effect, contending that here, at least, the end-use is controlling. While it may be that, under some circumstances, the commercial designation of a deposit will vary according to the use of the deposit, such would not affect our holding here. Assuming that the use of the deposit is relevant in determining its commercial meaning, we think it clear that the evidence would remain far from conclusive that the commercial designation of the deposit in issue here was calcium carbonate, rather than oyster shell. Moreover, the Tax Court, assuming the use of the deposit to be relevant and therefore considering it, nevertheless concluded that all of appellant's product was commercially classified as oyster shell.

The finding of the Tax Court, that all of the deposit mined and sold by the appellant was oyster shell, including that portion sold for its calcium carbonate content, is not clearly erroneous; indeed, it was compelled under the facts. It is affirmed.

The other issue before us concerns the deductibility, as ordinary and necessary business expenses, I.R.C.1939, Sec. 23(a)(1) and I.R.C.1954, Sec. 162, of payments made to Edgar Haden from 1952 through 1956. The payments were made pursuant to a contract of employment of Edgar in an advisory capacity. Briefly stated, the position of the government is that it was never anticipated that Haden would render any services to the appellant; rather, the payments were made

9. In concluding that, under the 1939 Code, the taxpayer's limestone deposit was calcium carbonate for purposes of depletion, the court in H. Frazier Co. v. United States, Ct.Cl., 1962, 302 F.2d 521, 525–26, noted that oyster shells, clam shells, and marble, all *sources* of calcium carbonate, had been carved out of the calcium carbonate classification and specifi-

cally provided for at a depletion rate of five percent, whereas, limestone, also a source of calcium carbonate, had not been specifically provided for.

10. See also Quartzite Stone Co., 1958, 30 T.C. 511, 516, aff'd., 10th Cir., 1959, 273 F.2d 738.

in order to satisfy the wishes of Edgar's mother, widow of the founder of the company and a substantial shareholder of the appellant. The Tax Court found that Edgar "was placed upon the payroll to satisfy his mother, * * *, and * * * it was never contemplated that he render any actual services of any kind to petitioner".

The minutes of the board of directors of the appellant reflect that, on January 8, 1952, a committee was appointed to work out some arrangement with Edgar which would satisfy his mother.[11] The essence of the contract subsequently entered into was that Edgar would hold himself available for consultation.

The facts, as fully and fairly set forth in the opinion of the Tax Court, show that during the 4½ years that the contract was in force, Edgar was never, in fact, called upon to render any advisory, or other, services to the appellant. The contract was canceled by the appellant shortly after the death of Edgar's mother. The provisions of the contract are largely negative in nature. It was provided that Edgar: (1) would not hold himself out as a representative of the appellant; (2) would not make sales for the appellant; (3) would not make contracts for the appellant; (4) would not maintain an office on the appellant's premises; (5) would not indicate that he was employed by the appellant; (6) would not visit the appellant's premises unless requested; and (7) would not perform any services as a consultant unless asked to do so.

■ The parties do not dispute that retainer-type payments to a consultant to hold himself available for services are deductible as ordinary and necessary business expenses; and, so long as such was in fact the contemplation of the parties, the deductibility of the payments would not turn upon the question of whether in fact such services were ever rendered. On the other hand, such payments are not deductible, if, in fact, they are made, not for business reasons, but to effectuate a non-business purpose. And the fact that the payments are made pursuant to a binding contract does not, of itself, determine the deductibility of the payments, because the "origin and nature, and not the legal form, of the expense sought to be deducted determines the applicability of the words of" the statute. Interstate Transit Lines v. Commissioner, 1943, 319 U.S. 590, 594, 63 S.Ct. 1279, 1282, 87 L.Ed. 1607.

■ Whether the payments were made to serve a business purpose, or merely to effectuate personal, non-business purposes, was a fact question for the determination of the Tax Court. When we consider the terms of the contract, the circumstances surrounding its consummation, and the fact that Edgar was never called upon to render any services, we think that the record amply supports the finding below.

Nor are we impressed with the taxpayer's alternative contention, that the contract implied a covenant on Edgar's part not to compete with the appellant. It appears that Edgar had, many years before the period here in question, entered into competition with the appellant, to the latter's detriment. Cecil Haden, the president of the appellants, testified that the principal motive for the contract was the fear of competition from Edgar Haden. But the contract contains no promise not to compete, and the relevant board minutes are silent on that question. In addition, there was no evidence that Edgar was now in a position to pose a competitive threat to the appellant; quite the contrary. The appellant was well-established in its business, whereas

---

11. The minutes state: "Mr. C. R. Haden presented a proposition to the Board that some arrangement be worked out to quiet the unrest occasioned by the non-employment of his brother, Edgar D. Haden, as Mrs. Lucy L. Haden, a substantial stockholder of this corporation was very desirous of having her son Edgar employed in some capacity. Motion was made by Mr. A. A. Horn appointing Mr. W. P. Hamblen, Cecil R. Haden and Edwin E. Lund as a committee to work out some arrangement that would serve this purpose * * *."

Edgar had been out of business since the early years of World War II. The issue as to whether the contract is to be construed as implying a covenant not to compete was, once again, one of fact. The Tax Court, in resolving that issue against the appellant, did not err.

For the reasons above given, the judgment of the Tax Court is affirmed.