*Decision will be entered under Rule 155.*

C. J. LANGENFELDER & SON, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8895–75.     Filed December 6, 1977.

---

*Richard W. Case* and *David Bielawski,* for the petitioner.
*Robert B. Perry,* for the respondent.

HALL, *Judge:* Respondent determined a $55,920.24 deficiency in petitioner's income tax for its taxable year ending December 31, 1968. Because of concessions made by the parties, the issues for decision are:

1. Whether petitioner had an economic interest in oyster shells which it dredged for the State of Maryland, so as to entitle it to a deduction for depletion under section 611(a).[1]

2. Whether petitioner is entitled to a percentage depletion rate under section 613(b) of 5 percent for 1968 and 1971,[2] or of 15 percent for 1968 and 14 percent for 1971 with respect to the oyster shells it dredged and sold to New Jersey, Virginia, and the Potomac River Fisheries Commission for use as oyster cultch.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner C. J. Langenfelder & Son, Inc., is a Maryland corporation. At the time the petition was filed, its principal place of business was in Baltimore, Md.

The State of Maryland has for many years operated an oyster propagation program. The program's primary concern is to provide a substrate on which immature oyster larvae may attach

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during 1968 and 1971.

[2] Although the deficiency in the present case is for 1968, a portion thereof is attributable to an adjustment in petitioner's taxable income for 1971. That adjustment affects a claimed net operating loss incurred in 1971, which petitioner carried back to 1968.

themselves and grow. Immature oyster larvae develop a capacity for movement approximately 2 hours after fertilization. A larva is able to move vertically up and down in the water by rhythmically vibrating its cilia. However, it has virtually no control over its horizontal movement. A larva feeds and grows for approximately 14 days after which it begins to change its structure, developing the rudiments of a shell. The increased weight of the larva causes it to sink to the bottom of the Chesapeake Bay, where it attaches itself to a substrate to remain for the rest of its life. This substrate is generally called "oyster cultch." If no oyster cultch is present on the floor of the Bay, the larvae will usually be smothered in sand and mud and die very quickly. Thus, in order for the larvae to grow and produce mature oysters they must attach themselves to a clean, hard surface. Almost any substance will suffice as oyster cultch, so long as it is clean and has a smooth surface. In experiments, broken glass, astroturf, broken bricks, limestone, cinders, tires, and slag have been used as oyster cultch. In addition, tin cans and rubber gloves have been used as oyster cultch. However, because of their availability, price, handling ease, and capacity for catching and growing young oysters, oyster shells were the only material used in Maryland's oyster propagation program.

Maryland's oyster propagation program utilized two methods of increasing the oyster population in the Bay. Under the first method, oyster shells are planted near existing oyster bars to provide additional substrate for the larvae. Under the second method, shells are planted in areas containing a dense concentration of oyster larvae but no existing oyster bars. The shells are then dredged up after half a year and transplanted to areas where conditions for growth of the baby oysters are more favorable (usually near existing oyster bars). This latter method of oyster propagation required the use of materials light enough so that when the young oysters and the cultch to which they are attached are dredged for transplantation, the young oysters are not damaged. Slag was not successful for this method of oyster propagation because the mortality rate of the young oysters in transplanting reached 70 percent. Oyster shells, because relatively light weight, do not suffer from this defect found in slag and other heavy materials. In addition, the shape of oyster shells, their surface contours, and their specific gravity which

prevents them from sinking into the mud and sand all made them the best possible material for use as oyster cultch.

Prior to 1959 the State of Maryland had used fresh oyster shells which it obtained from shucking houses for its program. However, due to a scarcity of these shells the State turned to the dead submerged oyster beds for a supply of cultch material.

In late 1959 the State of Maryland issued an invitation to bid on the "right to take and remove dead oyster and clam shells and dead shell deposits from the bottom of the Chesapeake Bay for the use of the State of Maryland and for the use of the bidder."

The invitation to bid was issued in order to provide adequate supplies of oyster shells to be used as oyster cultch for Maryland's oyster propagation program. The invitation requested bids "on both (1) the price per cubic yard to be charged the State for shells to be delivered to the State and (2) the price per cubic yard to be paid to the State for shells to be kept or used by the bidder, or bids may be submitted on item (1) only."

On January 27, 1960, petitioner submitted a bid in which it offered to dredge 200,000 cubic yards of shells to be delivered to the State at a cost of $1.10 per cubic yard. This bid was predicated upon the granting of a right to petitioner to dredge an additional 200,000 cubic yards of shells for its own use. Petitioner offered to pay the State a royalty of $0.90 per cubic yard for the shells it retained for its own use.

Following submission of its bid, petitioner and the Department of Tidewater Fisheries entered into an agreement dated April 14, 1960, which implemented the terms of the invitation to bid and petitioner's bid. The agreement provided in part:

GRANT OF RIGHT AND PRIVILEGE TO DREDGE DEAD SHELL

State hereby grants to Langenfelder, for the period of this Agreement, subject to compliance with all terms and conditions herein specified, the exclusive right and privilege to take and remove dead oyster and clam shells and dead shell deposits, hereinafter referred to as Shell, from the bottom of the Chesapeake Bay, including Tangier and Pocomoke Sounds.

\* \* \* \* \* \* \*

TERM OF AGREEMENT

The term of this Agreement shall commence on June 1, 1960, and terminate on May 31, 1962.

### SALE OF SHELL TO STATE

Langenfelder agrees to supply to State, and State agrees to accept, a minimum of two hundred thousand (200,000) cubic yards of shell per annum at a price of One Dollar Ten ($1.10) Cents per cubic yard, or a total price for the 200,000 cubic yards of Two Hundred Twenty Thousand ($220,000.00) Dollars. Langenfelder agrees to supply to State at the herein specified cubic yard price such additional shell as State may require during the term of this Agreement.

\* \* \* \* \* \* \*

Langenfelder agrees that all shell dredged by it shall be washed clean on the dredge, to be, in the opinion of experts of the Department of Tidewater Fisheries, suitable for catching larvae and forming spat for seed oysters.

### GUARANTEED ROYALTY TO STATE

In consideration of the grant of the right and privilege to dredge dead shell from the bottom of the Chesapeake Bay, Langenfelder agrees that it will dredge and retain for its own use or disposal an additional guaranteed total of two hundred thousand (200,000) cubic yards of shell per annum and will pay State Ninety ($.90) Cents per cubic yard therefor, amounting to a guaranteed total annual payment of One Hundred Eighty Thousand ($180,000.00) Dollars. Langenfelder agrees that it will not take or remove any shells for its own use or disposal in excess of the maximum herein specified of 200,000 cubic yards per annum.

Following execution of the April 14, 1960, agreement, petitioner and the department executed a supplemental agreement dated February 13, 1961. This agreement increased the amount of shells petitioner was required to supply to the State and the amount petitioner was required to dredge for its own use from 200,000 cubic yards for each purpose to 300,000 cubic yards for each purpose. In addition, the February 13, 1961, agreement extended the term of the agreement to May 31, 1967.

Thereafter on May 17, 1962, the department and petitioner entered into a supplemental agreement extending the time within which petitioner could dredge dead oyster shells for its own use from May 31, 1967, until December 31, 1972. On December 31, 1963, the term of the April 14, 1960, agreement was again extended by supplemental agreement from May 31, 1967, until May 31, 1977, and the period in which petitioner could dredge oyster shells for its own use was extended from December 31, 1977, until December 31, 1982.

In order to implement its oyster propagation program the department entered into a second agreement with petitioner. This agreement dated March 2, 1961, provided, inter alia, that petitioner was to transport the oyster shells from the dredging

sites to various planting sites. At the planting sites petitioner was to spread the shells in accordance with the instructions of the department.

Under the terms of the April 14, 1960, agreement the State of Maryland annually would designate the general area in which petitioner's dredging operations were to be conducted. However, the specific dredging site was selected by petitioner. In some instances, an employee of the State would accompany petitioner's employees when the actual dredging operations were being carried out. In addition, a State employee always accompanied petitioner's employees for the planting operation.

At all times the State determined the time and location of petitioner's dredging operations. Invariably petitioner would dredge oyster shells for the State from late April or early May through the end of June. Dredging would continue into October and November for customers other than the State.

After dredging the oyster shells for the State, petitioner washed and loaded the shells on barges and transported them to the designated planting sites where the shells were subsequently spread over the bottom of the Bay.

During 1968 petitioner supplied 369,472.60 cubic yards of dead oyster shells to the State of Maryland for which it was paid $406,419.86.

In addition, petitioner in 1968 dredged and retained dead oyster shells for its own use which it disposed of as follows:

| Sold to | Quantity (cubic yards) | Total sale price | Use for which sold |
|---|---|---|---|
| State of New Jersey | 32,593.00 | $127,753.00 | oyster cultch |
| State of Virginia | 32,228.44 | 99,908.16 | oyster cultch |
| Potomac River Fisheries Commission | 60,396.40 | 165,971.22 | oyster cultch |
| Oyster Shell Corp. | 120,950.00 | 193,512.43 | poultry feed |

During 1971 petitioner supplied 300,398.23 cubic yards of dead oyster shells to the State of Maryland for which it received $330,435.86.

In addition, petitioner in 1971 dredged and retained dead oyster shells for its own use which it disposed of as follows:

| Sold to | Quantity (cubic yards) | Total sale price | Use for which sold |
|---|---|---|---|
| State of New Jersey | 23,409.00 | $89,987.43 | oyster cultch |
| State of Virginia | 30,151.55 | 96,677.93 | oyster cultch |
| Potomac River Fisheries Commission | 12,117.08 | 38,878.95 | oyster cultch |
| Oyster Shell Corp. | 102,600.00 | 191,983.95 | poultry feed |

In 1968 and 1971 petitioner paid the required minimum royalties of $270,000 to the State of Maryland for the right to dredge dead oyster shells for its own use.

During 1968 and 1971 the principal items of equipment used by petitioner in the dredging and cleaning of oyster shells were as follows:

| Description | Date placed in service | Purchase price |
|---|---|---|
| D 100 dredge "Laruno," built by Wiley Manufacturing Co. | June 10, 1963 | $418,828.83 |
| Washing and screening plant, located on the dredge "Laruno," purchased from Aggregates Equipment, Inc. | June 10, 1963 | 74,560.00 |

Both pieces of equipment were depreciable, and petitioner was entitled to a depreciation deduction with respect to both.

On its income tax returns for 1968 and 1971, petitioner claimed a percentage depletion deduction for both the dead oyster shells it dredged and supplied to the State of Maryland and for the dead oyster shells it dredged and retained for its own use. On its 1968 return petitioner computed its percentage depletion deduction using a 15-percent rate and on its 1971 return it used a 14-percent rate. Respondent in his statutory notice determined that petitioner was not entitled to a depletion deduction for the oyster shells it supplied to the State of Maryland.[3] Respondent also determined that petitioner was only entitled to a percentage depletion deduction rate of 5 percent for both 1968 and 1971 for the oyster shells it dredged and retained for its own use and which were sold for use as oyster cultch.[4]

## OPINION

Section 611(a) provides that "In the case of mines, oil and gas wells, other natural deposits and timber, there shall be allowed

---

[3]Respondent concedes petitioner is entitled to a depletion deduction for oyster shells it extracted and sold to New Jersey, Virginia, Potomac River Fisheries Commission, and the Oyster Shell Corp.

[4]Respondent concedes petitioner is entitled to a 15-percent depletion rate for 1968 and 14 percent for 1971 on shells sold to the Oyster Shell Corp. for poultry feed.

as a deduction in computing taxable income a reasonable allowance for depletion." However, only individuals owning an economic interest in a depletable resource are entitled to a deduction for depletion. *Palmer v. Bender*, 287 U.S. 551, 557 (1933); sec. 1.611–1(b)(1), Income Tax Regs. The test in determining whether a taxpayer possesses an economic interest was laid down in *Palmer v. Bender*. The taxpayer must acquire by investment an interest in the minerals in place, and the taxpayer must look to the income from the extraction of the minerals for a return of his investment. *Palmer v. Bender, supra* at 557; *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 314 (1956); sec. 1.611–1(b)(1), Income Tax Regs.

The first issue is whether petitioner is entitled to a depletion deduction under section 611 with respect to the dead oyster shells it dredged for the State of Maryland during 1968 and 1971.[5] More specifically, the issue is whether petitioner had an economic interest in the dead oyster shells it dredged for the State of Maryland. Respondent contends that petitioner merely possessed an economic advantage in these dead oyster shells, not an economic interest. Respondent concludes, therefore, that petitioner is not entitled to a deduction for depletion, and we agree.

In *Parsons v. Smith*, 359 U.S. 215 (1959), the Supreme Court considered whether contract coal miners possessed an economic interest in the minerals in place so as to be entitled to an allowance for depletion. The Court found that the miners possessed merely an economic advantage derived from production and as a consequence were not entitled to a depletion deduction. In reaching its decision the Court amplified the two-part test established in *Palmer v. Bender* and set out seven factors which it had considered in making its determination that the contract miners did not meet the requirements of either part of that test. Those factors were as follows:

(1) that petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it

---

[5] As previously noted, respondent concedes petitioner is entitled to a depletion deduction for oyster shells sold to New Jersey, Virginia, Potomac River Fisheries Commission, and the Oyster Shell Corp.

was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed price for each ton mined and delivered * * * and (7) that petitioners, thus agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal "was a personal covenant and did not purport to grant [petitioners] an interest in the [coal in place]." * * * [359 U.S. at 225.]

Viewing the agreement[6] in light of the criteria set forth in *Parsons,* we are of the opinion that petitioner did not possess an economic interest in the dead oyster shells it dredged for the State of Maryland. Petitioner did not look to the extraction and sale of the dead oyster shells for a return of capital. Instead, petitioner looked to the State of Maryland for payment of a set fee per cubic yard of oyster shells it dredged. See *Matagorda Shell Co. v. Commissioner,* 29 T.C. 1060, 1069–1071 (1958). Moreover, petitioner had no control over the amount of shells it could dredge each year. It was required to furnish the State with a specific amount of dead oyster shells per year, at a specific time. Petitioner could not increase its production or vary the dredging dates on which it was obligated to dredge dead oyster shells for the State of Maryland.

In addition, the contract between petitioner and the State of Maryland did not confer upon petitioner any property rights in the dead oyster shells. Under the contract, petitioner was required to dredge a fixed amount of dead oyster shells for the State of Maryland. No part of these shells could be freely disposed of by petitioner. Petitioner was required to deliver the entire amount to the State of Maryland for use in its oyster propagation program. Finally, petitioner's only investment was in its equipment and not in oyster shells, and its investment in

---

[6]As a preliminary consideration petitioner argues that it is entitled to a depletion deduction with respect to the oyster shells it supplied to the State of Maryland because respondent has allowed it a depletion deduction with respect to the oyster shells it dredged for its own use and sold to others. Respondent on the other hand argues that the Apr. 14, 1960, agreement which provided that petitioner could dredge oyster shells for the State at a fixed fee per cubic yard, and gave petitioner *the right to dredge an equal quantity of oyster shells for its own use upon the condition that it pay the* State a fixed royalty per cubic yard, in fact constitutes two separate contracts. He further argues that while petitioner possessed an economic interest in the dead oyster shells it dredged under the latter contract, it did not possess an economic interest with respect to the first contract. We do not believe it is necessary to determine, however, whether one or two contracts were made. In either case a depletion deduction would not be allowed since petitioner looked to the State of Maryland for all sums due under the first provision of the Apr. 14, 1960, agreement.

the dredging equipment was recoverable through depreciation. In view of these facts, we conclude that petitioner did not have an economic interest in the dead oyster shells it harvested for the State. Like the contract miners in *Parsons v. Smith,* petitioner was merely a contract dredger. Petitioner is therefore not entitled to a deduction for depletion for those shells.[7]

The second issue is whether, in computing its percentage depletion deduction for the oyster shells dredged and subsequently sold for use as oyster cultch to New Jersey, Virginia, and the Potomac River Fisheries Commission, petitioner is entitled to a depletion rate of 15 percent for 1968 and 14 percent for 1971.[8]

Section 611(a) allows a deduction for depletion in computing taxable income. The formulae for computing the deduction allowed by this section are set forth in part in sections 612 and 613. Section 613(a) authorizes percentage depletion and section 613(b) sets forth the percentage depletion rates applicable to various natural deposits. Section 613(b)(7) provides generally for a 15-percent[9] percentage depletion rate for oyster shells, among other minerals not specifically enumerated in other provisions of section 613(b) "except that, * * * , the percentage shall be 5 percent for any such other material * * * when used, or sold for use * * * as rip rap, ballast, road material, rubble, concrete aggregates or for similar purposes."

Respondent contends that petitioner is only entitled to a 5-percent depletion rate under section 613(b)(7). In support of his contention respondent raises two arguments. Respondent first argues that the higher percentage depletion rate is applicable only if the oyster shells are used solely for their calcium carbonate content. He asserts that when oyster shells are used for their physical (rather than chemical) properties the lower percentage depletion rate is applicable. Alternatively, respondent contends that materials generally used as rip rap, ballast, road material, rubble, and concrete aggregates could be used as

---

[7]Having held that petitioner did not have an economic interest in the shells in place, we need not consider respondent's second argument that because the oyster shells supplied by petitioner to the State of Maryland were redeposited in the Chesapeake Bay, the total supply of oyster shells in the Bay was not depleted.

[8]Respondent concedes that oyster shells sold to the Oyster Shell Corp. for poultry feed are entitled to the 15 percent rate in 1968 and the 14 percent rate in 1971.

[9]In 1968, a 15-percent depletion rate was applicable for "other minerals" under sec. 613(b)(7). In 1971 a 14-percent depletion rate was applicable to "other minerals" under sec. 613(b)(7).

oyster cultch, so that the lower percentage depletion rate must be applied to prevent oyster shells from having an unfair competitive advantage. Petitioner contends, however, that as a general rule oyster shells are subject to the higher depletion rate, and the lower depletion rate is applicable only in those instances in which the shells are used or sold for use as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes.

As to respondent's first argument, we are of the opinion that his interpretation of the statute is unduly narrow. Prior to 1967 the percentage depletion rate for oyster shells was 5 percent, whereas the percentage depletion rate for calcium carbonate, the principal component of oyster shells, was 15 percent. See generally *W. D. Haden Co. v. Commissioner*, 321 F.2d 169, 170 (5th Cir. 1963). In 1966 Congress amended section 613(b)(7) to include oyster shells within the category of "other minerals" entitled to a 15-percent depletion rate.[10] In its explanation of the change the Senate Finance Committee stated:[11]

> Under present law, clam shells and oyster shells are allowed a percentage depletion rate of 5 percent. This rate applies even though the shells are used because of their chemical content—calcium carbonate—in the production of cement or lime. On the other hand, when other minerals, such as limestone, are used as a source of calcium carbonate, percentage depletion at the rate of 15 percent is allowed under existing law.
>
> Clam and oyster shells are composed almost entirely of calcium carbonate and in fact, contain a much higher percentage of calcium carbonate than do limestone and marble. Your committee believes that when clam and oyster shells are used for their calcium carbonate content—such as in the making of cement or lime—they should have the same percentage depletion rate as limestone and other calcium carbonates.
>
> Accordingly, the committee amendment provides that in the case of clam shells and oyster shells (as well as other mollusk shells), a percentage depletion rate of 15 percent generally is to apply. However, as is true under existing law in the case of limestone and other calcium carbonates, a 5 percent rate is applicable if the shells are used, or sold for use, as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes.
>
> The amendment is applicable to taxable years beginning after the date of enactment of the act.

The committee report reveals that Congress was attempting to equalize the treatment extended to miners of oyster shells and

---

[10]Sec. 208 of the Foreign Investors Tax Act of 1966, 80 Stat. 1579.

[11]S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1104.

limestone and other calcium carbonates. In so doing Congress struck the words "mollusk shells (including clam and oyster shells)" from then subparagraph 5(A)[12] of section 613(b) and inserted those words in subparagraph 6 of the same subsection. No attempt was made to limit application of the 15-percent depletion rate to only those instances in which oyster shells were used for their chemical attributes. Rather, the amendment provided that "in the case of clam shells and oyster shells (as well as other mollusk shells), a percentage depletion rate of 15 percent generally is to apply." The only limitation imposed was that found under the existing law, which provided for a 5-percent depletion rate where other calcium carbonates were used or sold for use, as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes.

Respondent contends, nevertheless, that the available percentage depletion rate is determined by whether oyster shells are used for their calcium carbonate. However, in *G. & W. H. Corson, Inc. v. Commissioner*, 54 T.C. 668 (1970), affd. 453 F.2d 578 (3d Cir. 1971), we rejected the application of a chemical attributes test in determining whether dolomitic limestone used in the manufacture of roadbuilding materials qualified for the higher depletion rate under section 613(b)(7). There we examined the legislative history of section 613(b)(7) in order to determine the meaning and application of the exception clause limiting percentage depletion to 5 percent. We concluded that the lower percentage depletion rate was applicable without regard to chemical characteristics where the functional use or end use of the particular mineral was specified in the exception clause or was "reasonably commercially competitive" with those enumerated uses. The Court then concluded that dolomitic limestone used as a roadbuilding material was commercially competitive with the specified materials, so that the lower rate applied. We are of the opinion that this test is equally appropriate to a determination of whether the higher or lower depletion rate of section 613(b)(7) is applicable to oyster shells. To apply a different test for oyster shells would result in differing treatment of minerals when congressional intent was

---

[12]Secs. 613(b)(5)(A) and 613(b)(6), appear as secs. 613(b)(6)(A) and 613(b)(7); respectively, today as well as during 1968 and 1971.

to square the treatment of oyster shells with that of other minerals containing calcium carbonate.

Thus, the question is whether the use of oyster shells as oyster cultch is a use similar to (reasonably commercially competitive with) that of rip rap, ballast, road material, rubble, and concrete aggregates. If the use is similar, then petitioner is entitled only to a 5-percent depletion rate on the oyster shells it dredged and sold to New Jersey, Virginia, and the Potomac River Fisheries Commission as oyster cultch.

We note initially that the uses specifically enumerated within the exception clause of section 613(b)(7) are generally construction uses. See *G. & W. H. Corson, Inc. v. Commissioner, supra.* Here the oyster shells were not so used. Nonetheless, respondent argues that construction stones could have been used competitively with oyster shells as oyster cultch; respondent contends, therefore, that to allow petitioner the higher depletion rate would discriminate against miners of construction stones.

The testimony of both petitioner's and respondent's experts makes it clear that oyster shells were the best available material for use as oyster cultch. No other material, including those limited to a 5-percent depletion rate, was reasonably commercially competitive with oyster shells for this purpose. The reasons were oyster shells' availability, price, ease of handling, shape, surface contours, specific gravity, and overall capacity for catching and growing young oysters. In fact, no other material had been used as oyster cultch in the Chesapeake Bay except on an experimental basis. One of these materials, slag, proved to be unsuccessful because its weight damaged large amounts of the young oysters when they, while attached to the slag, were being transplanted. In light of these facts, we conclude that oyster shells did not compete commercially with materials which would qualify as rip rap, ballast, road material, rubble, and concrete aggregate for use as oyster cultch. We therefore hold that the exception clause of section 613(b)(7) is not applicable; accordingly, petitioner is entitled to the higher depletion rate under section 613(b)(7) with respect to the oyster shells it dredged, retained, and sold for use as oyster cultch.

*Decision will be entered under Rule 155.*