T.C. Memo. 1997-51


UNITED STATES TAX COURT


BRYAN ROCK PRODUCTS, INC. AND SUBSIDIARY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23230-94.                    Filed January 28, 1997.


<u>Walter A. Pickhardt</u>, for petitioner.

<u>John C. Schmittdiel</u>, for respondent.


MEMORANDUM OPINION


TANNENWALD, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes for the taxable years ending
November 30, 1989, and November 30, 1990, in the amounts of
$23,926 and $25,622, respectively.  The sole issue for decision
is whether petitioner is entitled to a 14-percent depletion

allowance under section 613(b)(7)[1] for the red dolomitic limestone mined and sold by petitioner as landscaping rock.

This case was submitted fully stipulated under Rule 122. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Background

Petitioner is a Minnesota corporation with its principal office in Shakopee, Minnesota. For the taxable years ending November 30, 1989, and November 30, 1990 (1989 and 1990, respectively), petitioner was the common parent of a consolidated group of corporations that joined in the filing of a consolidated corporate income tax return.

Petitioner mines a material referred to as either dolomite or dolomitic limestone from three quarries in Shakopee, Minnesota, and additional quarries in Bayport, Hastings, and Denmark, Minnesota. This material comes within the meaning of either dolomite or limestone, or both, as those terms are used in section 613(b)(7). Hereinafter, we will refer to this material as dolomite. Petitioner's dolomite comes from the Oneonta Dolomite and Shakopee formation of the Prairie du Chien Group, an expansive sedimentary rock deposit extending throughout southeastern Minnesota and into portions of Wisconsin and Iowa.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Oneonta Dolomite is composed of both limestone and dolomite, with the latter distinguishable from the former by reason of its greater magnesium content. Petitioner's dolomite is of insufficient purity to be considered metallurgical or chemical grade.

Most limestone and dolomite in Minnesota and neighboring States is of a buff or brownish-gray color. Petitioner mines buff and brownish-gray dolomite from its quarries. Petitioner also has mined a reddish-brown colored dolomite from two of its quarries at Shakopee, Minnesota. The reddish color most likely is caused by its iron oxide content. We shall refer to this particular dolomite as red dolomite. During 1989 and 1990, petitioner mined red dolomite from its Merriam Quarry, located in Shakopee, Minnesota. Petitioner currently mines red dolomite from its 169 Quarry, which is located approximately one-half mile from the Merriam Quarry.

Road material is aggregate[2] used in the construction of roads. Typically, a base consisting of crushed and graded aggregate is placed on roadbeds, parking lots, and in utility trenches to provide support for the overlying pavement or utility. Road material aggregates are also material mixed with

---

[2] "Aggregate" is: "1. rock composed of mineral crystals of one or more kinds or of mineral rock fragments. 2. any of several hard materials (as sand, gravel, or slag) used for mixing with cement material to form concrete, mortar, or plaster." Webster's Ninth New Collegiate Dictionary 64(1985).

asphaltic cement or concrete to produce asphalt or concrete.  The types of material suited for this use include crushed limestone and dolomite, other quarried rock, and sand and gravel.

Concrete aggregate is aggregate used in the production of concrete.  It is generally made up of washed and graded natural aggregate deposits or crushed quarry rock, typically occupies 65 to 75 percent of the concrete volume, and influences various properties of concrete.  Most rocks can be used as concrete aggregate with the exception of rocks containing any appreciable amounts of shale, soft porous materials, or chert.

Rip rap is a pile of rocks and boulders placed as an erosion control measure and slope stabilizer to protect slopes, piers, abutments, walls, or other structures.  There are specific size requirements and gradations for different classes of rip rap. Rip rap may be any type of durable, field or quarried stone, free of soil or other debris.  In southeastern and central Minnesota, where limestone is abundant, limestone and dolomite are used for rip rap.  In northern Minnesota, where carbonaceous deposits are not available, field stone, taconite, and granite are used as rip rap.

Ballast is a material which is placed on a railroad bed to provide a stable foundation for the track and ties.  Ballast distributes train loading, drains the roadbed, and resists deformation of the railbed.  Ballast can be any rock of specific size and gradation where it is durable and resists degradation.

In Minnesota, railroads generally use granite, gabbro, or taconite for ballast. Dolomite is not generally used because it is softer than desirable.

Rubble is a loose mass of angular fragments of rock or masonry crumbled by natural or human forces and irregular fragments or pieces of rock used in masonry or the masonry made with such rocks. The type of angular rock which may be incorporated in the rubble could be virtually any type of rock that is used in manmade structures.

Petitioner processes and sells the dolomite that it mines for the following products: driveway and road base rock; concrete aggregate; utility and bedding rock; and "specialty rock". "Specialty rock" includes rip rap, agricultural lime (aglime), red ball diamond aggregate, and landscaping rock. Petitioner did not sell dolomite for use as ballast during the years at issue.

Petitioner sells driveway and road base rock, which is available in sizes ranging from a maximum[3] of 3/8" to a maximum of 3" in diameter, for use as a base upon which a driveway or road surface (concrete or asphalt) is laid. This product includes dolomite fines, a powdery material created when dolomite

---

[3] Each product size actually includes a range of rock sizes. The maximum size within that range is used to label that size. For example, 1-3/4" size rock may range from 3/4" to 1-3/4"; the 3/4" size may range from 5/15" to 3/4".

is crushed; when compacted, dolomite fines facilitate the hardening of the roadbed.

The concrete aggregate sold by petitioner is a washed dolomite ranging in size from 5/16" to 3/4" in diameter. It is used, together with water, fine aggregate (usually sand), and cement, as an ingredient in concrete. During the years at issue, only the Merriam quarry, of all of petitioner's quarries, had washing facilities.

The utility and bedding rock sold by petitioner is dolomite ranging in size from 3/4" to 4" in diameter, with smaller sizes included in the product. Some dolomite fines are included, but not to the extent they are included with road base. Utility and bedding rock is used as a base for concrete pipe or PVC pipe, especially sewer pipe.

The rip rap sold by petitioner consists of dolomite used for erosion control, especially around waterways. Petitioner sells rip rap as small as 4" to 9" in diameter, but also in a small boulder size, 24" in diameter and sometimes larger. The aglime sold by petitioner is a fine, pulverized dolomite material, crushed to a size generally no larger than a grain of white rice, which is used to neutralize soil acidity and to provide magnesium to soil compositions. The red ball diamond aggregate sold by petitioner is identical to aglime in size and composition but, unlike aglime, always has a red color. Petitioner's customers used this product as a ball diamond surface.

The red landscaping rock sold by petitioner is washed, crushed red dolomite, sold in two sizes. The larger size is screened to an individual diameter size of not less than 3/4" and not more than 1-3/4" in diameter (1-3/4" red landscaping rock). The smaller size is screened to an individual diameter size of not less than 5/16" and not more than 3/4" in diameter (3/4" red landscaping rock). The 3/4" red landscaping rock sold by petitioner was identical to the 3/4" washed red rock that petitioner sold for use as a concrete aggregate.

Petitioner does not run reflectance tests, dry brightness test, or other test relating to the measurement of the color of its red landscaping rock. Petitioner does not sell red landscaping rock on bid in direct competition with a bona fide bid to sell a mineral listed in section 613(b)(3).

A common use of landscaping rock, including petitioner's red landscaping rock, is to lay it on the ground, several inches deep, to act as a border or buffer between adjoining areas or structure in a landscape or outdoor area. Landscape rock is also used to separate shrubs and other plantings from adjoining walkways, driveways, and lawn areas. Landscaping rock reduces maintenance (e.g., trimming, spraying, weeding) because it inhibits weed and grass growth in areas where growth is not desired. In this regard, landscaping rock is often used over plastic sheeting or a similar weed barrier. Consistent appearance, including color and size, is a consideration for

customers purchasing landscaping rock. Color is not normally a consideration for customers purchasing dolomite for use as driveway and road base rock, concrete aggregate (unless it is an exposed aggregate), utility and bedding rock, aglime, and rip rap. Rocks used for landscaping purposes include: limestone, dolomite, quartzite, sandstone, granite, pumice, marble, scoria, baked clay or shale, diabase, gabbro, and river rock. In addition to the various aggregates sold for landscaping rock, organic materials such as shredded hardwood or bark chips are sold for landscaping purposes.

On each of petitioner's price lists for 1989 and 1990, the 1-3/4" red landscaping rock was identified as "red decorative rock"; the 3/4" red landscaping rock was not so designated. On its price lists for 1989, the 3/4" red landscaping rock was identified as "washed red rock", which was the same designation given to rock sold as concrete aggregate. On its price lists for 1990, the 3/4" red landscaping rock was identified as "red rock", which was the same designation given to rock sold as concrete aggregate.

In general, during the years in issue, the geographical market for dolomite sold by petitioner for use as driveway and road base rock, utility and bedding rock, and rip rap consisted of an area no greater than a 30-mile radius from the quarry out of which the dolomite was extracted. Most of the dolomite sold by petitioner as a concrete aggregate was for use within a 30-

mile radius from the quarry out of which the dolomite was extracted; however, petitioner sometimes sold concrete aggregate to truckers who, having made deliveries in the Twin Cities area, would purchase a load of concrete aggregate as a back haul for delivery beyond a 30-mile radius. In contrast, petitioner regularly sold aglime and red ball diamond aggregate for use beyond a 30-mile radius from the quarry out of which the dolomite was extracted. Petitioner sold dolomite for use as red landscaping rock to charge customers in the following areas: Minnesota, Wisconsin, North Dakota, South Dakota, and Iowa. Red landscaping rock occasionally was sold in other States as well. Petitioner does not maintain records of the quantity of red landscaping rock sold within a 30-mile radius of its quarries in Shakopee.

For depletion purposes, petitioner identified instances when it sold "washed red rock" or "red rock" as concrete aggregate and when it sold this rock for landscaping purposes.

For 1989 and 1990, petitioner claimed percentage depletion under section 613(b)(7) equal to 14 percent of sales less royalties on its dolomite sold for use as red landscaping rock. Petitioner also claimed 14-percent depletion on dolomite sold for use as aglime and as red ball diamond aggregate. Petitioner claimed 5-percent depletion on dolomite sold for use as driveway and road base rock, concrete aggregate, utility and bedding rock, and rip rap.

Respondent determined that the proper rate of depletion for petitioner's red landscaping rock is 5 percent, not 14 percent. Respondent has not proposed adjustments in connection with petitioner's depletion deductions except for those claimed for dolomite sold as red landscaping rock.

Discussion

Section 611 provides for a reasonable allowance for depletion in the case of mines. This allowance is "the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." Sec. 613(a). Section 613(b)(6) provides in relevant part:

> (6) 5 Percent--
>
> (A) gravel, peat, pumice, sand, scoria, shale * * *, and stone (except stone described in paragraph (7));

Section 613(b)(7) specifies a 14-percent depletion rate for:

> all other minerals, including, but not limited to, * * * dolomite, * * * limestone, * * * stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), * * * except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral * * * when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. * * *

Initially, respondent argues that petitioner's red landscaping rock should be classified as "stone" under section 613(b)(6) because the red landscaping rock was not used for its chemical or metallurgical properties; this classification would result in a 5-percent depletion rate. Prior to the enactment of the 1954 Code, the predecessor to section 613(b) provided a 5-percent depletion rate for sand, gravel, and stone; a 10-percent rate for dolomite; and a 15-percent rate for chemical and metallurgical grade limestone. Sec. 114(b)(4)(A) of the 1939 Code, as amended by the Revenue Act of 1951, ch. 521, sec. 319(a), 65 Stat. 452, 497; G. & W. H. Corson, Inc. v. Commissioner, 54 T.C. 668, 675 (1970), affd. 453 F.2d 578 (3d Cir. 1971). However, in section 613(b) of the 1954 Code, the qualifiers "chemical grade" and "metallurgical grade" were dropped from limestone, dolomite was added to the 15 percent (now 14 percent) depletion rate category, and the "use test", i.e., "when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes", was added. Thus, whether limestone is of chemical grade is no longer a factor. G. & W. H. Corson, Inc. v. Commissioner, supra; see also C. J. Langenfelder & Son, Inc. v. Commissioner, 69 T.C. 378 (1977) (chemical attributes test rejected for use of oyster shells). Accordingly, the chemical and metallurgical properties foundation of respondent's argument falls by the wayside.

The parties have agreed that petitioner's red landscaping rock qualifies as either dolomite or limestone. As dolomite and limestone both are listed in section 613(b)(7), and those terms are more specific than stone, section 613(b)(7), rather than section 613(b)(6), governs our determination of the proper depletion rate.

Since petitioner did not sell its red landscaping rock on bid in direct competition with a bona fide bid to sell a mineral listed in section 613(b)(3), the focus of this case is on the "use test". We are asked to decide whether petitioner sold its red landscaping rock for a purpose similar to rip rap, ballast, road material, rubble, or concrete aggregates (the enumerated uses).

Congress added the use test in 1954 in order "to prevent discrimination in percentage depletion rates between materials which are used competitively for the same purposes." S. Rept. 1622, 83d Cong., 2d Sess. 77 (1954). When the minerals in the category "all other minerals", otherwise entitled to a depletion rate of 14 percent, are used "for certain purposes for which crushed stone is commonly used, they are to be entitled to a percentage depletion rate of 5 percent." Id. Congress specified these certain purposes as "rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes". Sec. 613(b)(7). The use test is one of actual use, not possible uses. The statutory language speaks in terms of actual use. Sec.

613(b)(7) ("when used, or sold for use").  The legislative history clearly points in the same direction.  S. Rept. 1622, supra at 77, 331-332.

The House version of this section had included dimension stone and ornamental stone in the enumerated uses, but in the final bill, those were eliminated and, instead, "stone (used or sold for use * * * as dimension stone or ornamental stone)" was included in the list of "all other minerals", thus entitling stone used for those purposes to the higher depletion rate.  Id. at 78.  Dimension stone means "blocks and slabs of natural stone, subsequently cut to definite shapes and sizes and used or sold for such uses as building stone (excluding rubble), monumental stone, paving blocks, curbing and flagging."  Sec. 1.613-2(b)(3), Income Tax Regs.  Ornamental stone means "blocks and slabs of natural stone, subsequently cut to definite shapes and sizes and used or sold for use for making ornaments or statues."  Id.

The enumerated uses are generally construction uses.  C. J. Langenfelder & Son, Inc. v. Commissioner, supra at 390.  We have interpreted "similar purposes" to include those uses reasonably commercially competitive with the enumerated uses.  G. & W. H. Corson, Inc. v. Commissioner, 54 T.C. at 677.

In G. & W. H. Corson, Inc. v. Commissioner, supra, the taxpayer mined dolomitic limestone for its use in manufacturing Poz-O-Pac and Corson's masonry cement.  Poz-O-Pac was a product composed of hydrated lime, fly ash, an aggregate, and water; it

was used primarily as a base for road surface.  Other manufacturers of Poz-O-Pac used gravel instead of limestone.  We found that the function of the limestone in the Poz-O-Pac was similar to the function of road material in the laying of asphalt and other forms of roadways.  Poz-O-Pac also competed with concrete, and the limestone in the Poz-O-Pac had a significant use similar to a concrete aggregate.  The primary use of the taxpayer's masonry cement was as a mortar.  We found that the limestone in the product served the purpose of aggregate comparable to that mixed with Portland cement to make other masonry cements or mortars.  The taxpayer's limestone acted as a functional substitute for, and thus in actual competition with, materials used as road material and concrete aggregate.  Consequently, we held that the lower depletion rate applied to the limestone so used by the taxpayer.

In C. J. Langenfelder & Son, Inc. v. Commissioner, supra, the taxpayer dredged oyster shells for sale as cultch, a surface to which oyster larvae could attach and grow into mature oysters.  Mollusk shells, including oyster shells, are listed in section 613(b)(7).  Following G. & W. H. Corson, Inc. v. Commissioner, supra, we rejected respondent's argument that use for physical rather than chemical attributes leads to the lower depletion rate and  applied the use test.  We found that the use of oyster shells as cultch was not a construction use.  Respondent argued "that construction stones could have been used competitively with

oyster shells as oyster cultch" and "therefore, that to allow [the taxpayer] the higher depletion rate would discriminate against miners of construction stones." C. J. Langenfelder & Son, Inc. v. Commissioner, supra at 390. We rejected respondent's potential-for-use argument and found that, used as oyster cultch, oyster shells did not compete commercially with materials that would qualify as rip rap, ballast, road materials, rubble, and concrete aggregate. We, therefore, held that the exception circumscribed by the use test did not apply, entitling the taxpayer to the higher depletion rate.

In Maryland Green Marble Corp. v. United States, 528 F.2d 51 (4th Cir. 1975), the Court of Appeals for the Fourth Circuit interpreted the use test to mean: sold or used for the same purpose as, and in competition with, construction stones. The taxpayers' marble and quartzite chips were used in the manufacture of terrazzo flooring and architectural precast panels, respectively, for their distinctive coloring and decorative qualities. The Court of Appeals found that these features distinguished the chips from ordinary hard stone and that the chips did not compete with ordinary construction stones. It held that the taxpayers were entitled to the higher depletion rate.

In Bonsal Co. v. United States, 72-1 USTC par. 9175, 29 AFTR 2d 72-535 (W.D.N.C. 1971), the only case dealing with rock used for landscaping purposes, the District Court looked strictly to

the statutory language of section 613(b)(7) and did not consider competition to be a "significant consideration".  It held that the uses of quartzite for roofing, mosaic panels, golf course sandtraps, and landscaping were not purposes similar to rip rap, ballast, road material, rubble, or concrete aggregates in the conventional sense and allowed the taxpayer the higher depletion rate for these uses.

In the instant case, respondent argues that landscaping is a construction use and that petitioner's red landscaping rock competes with materials that could be used for one of the enumerated uses, including petitioner's red rock used as concrete aggregate.

Since actual use is the focus of the use test, whether the sale of petitioner's red landscaping rock competes with the sale of its same rock as concrete aggregate is not a determination. In this connection, we think it highly significant that petitioner kept detailed records that separated the sales of 3/4" red rock for concrete aggregate from sales of the same rock as landscaping rock and claimed only the 5 percent on the former.[4] Furthermore, although the legislative history records Congress' concern about competition between the listed minerals and common

_____

[4] Respondent has not questioned the accuracy of these records either as to allocations of quantities or sales amounts. Cf. Reagan v. Commissioner, T.C. Memo. 1973-266, where respondent did not question the application of the 5-percent and 14-percent rates to different uses of the same mineral.

stone, the use test as written in the statute does not extend to include each use where common stone could be used.  In keeping with this Court's previous decisions involving the use test, we think the critical test herein is whether the subject rock in fact competed commercially with common stone in the specific use placed at issue.

Petitioner's red rock when used as landscaping rock is not used for a purpose which is a functional substitute for one of the enumerated uses.  Thus, it does not compete commercially with the enumerated uses.  Cf. G. & W. H. Corson, Inc. v. Commissioner, 54 T.C. 668 (1970).  It is used for a decorative purpose, not for a construction use.  Its purpose, although not exactly that of dimension stone, i.e., stone used for building stones, paving blocks, curbing, and flagging, is more similar to the use of dimension stone than to the enumerated uses.

Many of the other materials sold as landscaping rock are among those listed as "all other minerals" in section 613(b)(7).  The geographic market for petitioner's red landscaping stone is much greater than for the same stone when sold as concrete aggregate.  These factors indicate that petitioner's red landscaping rock is competing with the "other minerals", not with ordinary stone.  We find that petitioner's red landscaping rock was not sold for a purpose similar to rip rap, ballast, road material, rubble, or concrete aggregates.  Therefore, petitioner

is entitled to the 14-percent depletion rate for its red landscaping rock.

In accordance with the above holding,

<u>Decision will be entered</u>

<u>for petitioner</u>.